# FULTON CORP. *v.* FAULKNER, SECRETARY OF REVENUE OF NORTH CAROLINA

No. 94–1239.   Argued October 31, 1995—Decided February 21, 1996

SOUTER, J., delivered the opinion for a unanimous Court. REHNQUIST, C. J., filed a concurring opinion, *post*, p. 348.

*Jasper L. Cummings, Jr.*, argued the cause and filed briefs for petitioner.

*Charles Rothfeld* argued the cause for respondent. With him on the brief were *Michael F. Easley*, Attorney General of North Carolina, *Marilyn R. Mudge*, Assistant Attorney General, and *Laurie R. Rubenstein*.*

JUSTICE SOUTER delivered the opinion of the Court.

In this case we decide whether North Carolina's "intangibles tax" on a fraction of the value of corporate stock owned by North Carolina residents inversely proportional to the corporation's exposure to the State's income tax violates the Commerce Clause. We hold that it does.

I

During the period in question here, North Carolina levied an "intangibles tax" on the fair market value of corporate stock owned by North Carolina residents or having a "business, commercial, or taxable situs" in the State. N. C. Gen. Stat. § 105–203 (1992).[1] Although the tax was assessed at

---

*Jennifer Sartor Smart* filed a brief for the Commonwealth of Kentucky, Revenue Cabinet, as *amicus curiae* urging affirmance.

[1] The intangibles tax has subsequently been repealed. See 1995 N. C. Sess. Laws, ch. 41. Because the repeal has no retroactive effect, however, it does not affect the tax years at issue in this litigation. This case accordingly remains a justiciable controversy. See, *e. g., Powell* v. *McCormack*, 395 U. S. 486, 498–500 (1969) (holding that the obviation of the petitioner's claim for injunctive relief did not render the whole case moot, when a damages claim for backpay remained).

a stated rate of one quarter of one percent, residents were entitled to calculate their tax liability by taking a taxable percentage deduction equal to the fraction of the issuing corporation's income subject to tax in North Carolina. *Ibid.* This figure was set by applying a corporate income tax apportionment formula averaging the portion of the issuing corporation's sales, payroll, and property located in the State. See § 105–130.4(i).

Thus, a corporation doing all of its business within the State would pay corporate income tax on 100% of its income, and the taxable percentage deduction allowed to resident owners of that corporation's stock under the intangibles tax would likewise be 100%. Stock in a corporation doing no business in North Carolina, on the other hand, would be taxable on 100% of its value. For the intermediate cases, holders of stock were able to look up the taxable percentage for a large number of corporations as determined and published annually by the North Carolina Secretary of Revenue (Secretary). In 1990, for example, the Secretary determined the appropriate taxable percentage of IBM stock to be 95%, meaning that IBM did 5% of its business in North Carolina, with its stock held by North Carolina residents being taxable on 95% of its value. N. C. Dept. of Revenue, Stock and Bond Values as of December 31, 1990, p. 39.

Petitioner Fulton Corporation is a North Carolina company owning stock in other corporations that do business out of state. In the 1990 tax year, at issue in this case, Fulton owned shares in six corporations, five of which did no business or earned no income in North Carolina and therefore were not subject to the State's corporate income tax. Fulton's stock in these corporations was accordingly subject to the intangibles tax on 100% of its value. Fulton also owned stock in Food Lion, Inc., which did 46% of its business in North Carolina, with the result that its stock was subject to the intangibles tax on 54% of its value. App. 11.

Fulton's intangibles tax liability for the 1990 tax year amounted to $10,884. It paid the tax and brought this action in state court under Rev. Stat. § 1979, as amended, 42 U. S. C. § 1983, seeking a declaratory judgment that the scheme based on the taxable percentage deduction violated the Commerce Clause by discriminating against interstate commerce. Fulton also sought a refund under the terms of the appropriate state statute, N. C. Gen. Stat. § 105–267 (1992), and attorney's fees under Rev. Stat. § 722, as amended, 42 U. S. C. § 1988. On the parties' cross-motions for summary judgment, the state trial court ruled in favor of the Secretary.

On appeal, North Carolina's Court of Appeals reversed, holding that the taxable percentage deduction violated the Commerce Clause. *Fulton Corp.* v. *Justus*, 110 N. C. App. 493, 430 S. E. 2d 494 (1993). The Court of Appeals saw a facial discrimination against shareholders in out-of-state corporations in forcing them to pay tax on a higher percentage of share value than shareholders of corporations operating solely in North Carolina. *Id.*, at 499, 430 S. E. 2d, at 498. The court rejected the Secretary's contention that the intangibles tax amounted to a valid "compensating tax" designed to place a burden on interstate commerce equal to what intrastate commerce already carried under the corporate income tax. *Id.*, at 499–501, 430 S. E. 2d, at 498–499. Finally, the Court of Appeals distinguished this Court's decision in *Darnell* v. *Indiana*, 226 U. S. 390 (1912), which held that Indiana could tax the stock of foreign corporations to the extent that those corporations were not subject to the State's tax on in-state property. Because the tax regime in *Darnell* was constructed to avoid the double taxation of corporate property values, a result not accomplished by North Carolina's intangibles tax, the Court of Appeals did not view *Darnell* as being on point. 110 N. C. App., at 501–504, 430 S. E. 2d, at 499–501. The court refused Fulton any retrospective relief, however, and held the proper remedy to be elimination

of the percentage deduction provision from the intangibles tax scheme. *Id.*, at 504–505, 430 S. E. 2d, at 501–502.

Both parties appealed to the Supreme Court of North Carolina, which reversed. *Fulton Corp.* v. *Justus*, 338 N. C. 472, 450 S. E. 2d 728 (1994). Without addressing whether the intangibles tax was facially discriminatory, the court read *Darnell* to compel a conclusion that the scheme here imposed a valid compensating tax, 338 N. C., at 477–480, 450 S. E. 2d, at 731–734, and it rejected Fulton's contention that *Darnell* had been overruled implicitly by this Court's more recent decisions on interstate taxation. 338 N. C., at 480–482, 450 S. E. 2d, at 734–735. The court reasoned, moreover, that corporate income is generally related to the value of corporate stock, and that in practice, the burden on interstate commerce imposed by the intangibles tax was less than that placed on intrastate commerce by the corporate income tax. *Id.*, at 479–480, 450 S. E. 2d, at 733–734.

We granted certiorari, 514 U. S. 1062 (1995), and now reverse.

## II

The constitutional provision of power "[t]o regulate Commerce . . . among the several States," U. S. Const., Art. I, § 8, cl. 3, has long been seen as a limitation on state regulatory powers, as well as an affirmative grant of congressional authority. See, *e. g., Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 179–180 (1995); *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824) (Marshall, C. J.) (dictum). In its negative aspect, the Commerce Clause "prohibits economic protectionism—that is, 'regulatory measures designed to benefit instate economic interests by burdening out-of-state competitors.'" *Associated Industries of Mo.* v. *Lohman*, 511 U. S. 641, 647 (1994) (quoting *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273–274 (1988)). This reading effectuates the Framers' purpose to "preven[t] a State from retreating into economic isolation or jeopardizing the welfare of the Nation

as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Jefferson Lines, supra,* at 180.

In evaluating state regulatory measures under the dormant Commerce Clause, we have held that "the first step . . . is to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.'" *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.,* 511 U. S. 93, 99 (1994) (quoting *Hughes* v. *Oklahoma,* 441 U. S. 322, 336 (1979)). With respect to state taxation, one element of the protocol summarized in *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977), treats a law as discriminatory if it "'tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.'" *Chemical Waste Management, Inc.* v. *Hunt,* 504 U. S. 334, 342 (1992) (quoting *Armco Inc.* v. *Hardesty,* 467 U. S. 638, 642 (1984)); see also *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 332, n. 12 (1977) (noting that a State "may not discriminate between transactions on the basis of some interstate element"). State laws discriminating against interstate commerce on their face are "virtually *per se* invalid." *Oregon Waste, supra,* at 99; see also *Philadelphia* v. *New Jersey,* 437 U. S. 617, 624 (1978).

We have also recognized, however, that a facially discriminatory tax may still survive Commerce Clause scrutiny if it is a truly "'compensatory tax' designed simply to make interstate commerce bear a burden already borne by intrastate commerce." *Associated Industries, supra,* at 647.[2]

---

[2] We use the terms "compensatory" tax and "complementary" tax as two ways of describing the same phenomenon: a tax on interstate commerce "complements" a tax on intrastate commerce to the extent that it "compensates" for the burdens imposed on intrastate commerce by imposing a similar burden on interstate commerce. We have also described taxes

Thus, in *Henneford* v. *Silas Mason Co.*, 300 U. S. 577 (1937), we upheld the State of Washington's tax on the privilege of using any article of tangible personal property within the State. The statute exempted the use of any article that had already been subjected to a sales tax equal to the use tax or greater, so that the use tax effectively applied only to goods purchased out of state. Although the use tax was itself facially discriminatory, we held that the combined effect of the sales and use taxes was to subject intrastate and interstate commerce to equivalent burdens. "'There is no demand in . . . [the] Constitution that the State shall put its requirements in any one statute,'" we said; rather, "'[i]t may distribute them as it sees fit, if the result, taken in its totality, is within the State's constitutional power.'" *Id.*, at 584 (quoting *Gregg Dyeing Co.* v. *Query*, 286 U. S. 472, 480 (1932)). As Justice Cardozo explained for the Court, the complementary arrangement assures that "[w]hen the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed." 300 U. S., at 584.

Since *Silas Mason*, our cases have distilled three conditions necessary for a valid compensatory tax. First, "a State must, as a threshold matter, 'identif[y] . . . the [intrastate tax] burden for which the State is attempting to compensate.'" *Oregon Waste, supra*, at 103 (quoting *Maryland* v. *Louisiana*, 451 U. S. 725, 758 (1981)). Second, "the tax on interstate commerce must be shown roughly to approximate—but not exceed—the amount of the tax on intrastate

---

on interstate commerce as being imposed "in lieu" of taxes on intrastate commerce. See, *e. g., Railway Express Agency, Inc.* v. *Virginia*, 358 U. S. 434, 436 (1959); *Postal Telegraph Cable Co.* v. *Adams*, 155 U. S. 688, 700 (1895). This last class of cases, however, has involved taxes which were at least arguably not facially discriminatory, and we have evaluated these cases under a somewhat different standard.

commerce." *Oregon Waste*, 511 U. S., at 103. "Finally, the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive 'prox[ies]' for each other." *Ibid.* (quoting *Armco Inc.* v. *Hardesty, supra,* at 643).

## III

There is no doubt that the intangibles tax facially discriminates against interstate commerce. A regime that taxes stock only to the degree that its issuing corporation participates in interstate commerce favors domestic corporations over their foreign competitors in raising capital among North Carolina residents and tends, at least, to discourage domestic corporations from plying their trades in interstate commerce. The Secretary practically concedes as much, and relies instead on the compensatory tax defense.[3] The only

---

[3] Although the Secretary does suggest that the tax is so small in amount as to have no practical impact at all, we have never recognized a *"de minimis"* defense to a charge of discriminatory taxation under the Commerce Clause. See, *e. g., Associated Industries of Mo.* v. *Lohman,* 511 U. S. 641, 650 (1994) ("[A]ctual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred"); *Maryland* v. *Louisiana,* 451 U. S. 725, 760 (1981) ("We need not know how unequal the Tax is before concluding that it unconstitutionally discriminates"). We likewise reject the Secretary's speculation that the most likely effect, if any, of the taxable percentage deduction is to encourage out-of-state firms to compete in the North Carolina market so that their North Carolina shareholders may take advantage of the deduction. As we explain further, *supra,* at 330–331, such promotion of in-state markets at the expense of out-of-state ones furthers the "economic Balkanization" that our dormant Commerce Clause jurisprudence has long sought to prevent. *Hughes* v. *Oklahoma,* 441 U. S. 322, 325–326 (1979); see also *Halliburton Oil Well Cementing Co.* v. *Reily,* 373 U. S. 64, 72 (1963) (a State may not impose "a tax which is discriminatory in favor of the local merchant" so as to "encourag[e] an out-of-state operator to become a resident in order to compete on equal terms") (internal quotation marks and citation omitted).

issue, then, is whether the taxable percentage deduction can be sustained as compensatory.

## A

As we have said, a State that invokes the compensatory tax defense must identify the intrastate tax for which it seeks to compensate, see *supra*, at 332, and it should go without saying that this intrastate tax must serve some purpose for which the State may otherwise impose a burden on interstate commerce. In *Maryland* v. *Louisiana*, 451 U. S. 725 (1981), for example, we rejected Louisiana's argument that, because it imposed a severance tax on natural resources extracted from its own soil, it could impose a compensating "first use" tax on resources produced out of state but used within Louisiana. Because "Louisiana has no sovereign interest in being compensated for the severance of resources from the federally owned [Outer Continental Shelf] land," we held that "[t]he two events are not comparable in the same fashion as a use tax complements a sales tax." *Id.*, at 759.

In this case, the Secretary suggests that the intangibles tax, with its taxable percentage deduction, compensates for the burden of the general corporate income tax paid by corporations doing business in North Carolina. But because North Carolina has no general sovereign interest in taxing income earned out of state, *Maryland* v. *Louisiana* teaches that the Secretary must identify some in-state activity or benefit in order to justify the compensatory levy. Indeed, we have repeatedly held that "no state tax may be sustained unless the tax . . . has a substantial nexus with the State . . . [and] is fairly related to the services provided by the State." *Id.*, at 754; see also *Jefferson Lines*, 514 U. S., at 183–184; *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S., at 279. The Secretary does not disagree, but rather insists that North Carolina may impose a compensatory tax upon foreign corpo-

rations because they may avail themselves of access to North Carolina's capital markets.

The Secretary's theory is that one of the services provided by the State, and supported through its general corporate income tax, is the maintenance of a capital market for corporations wishing to sell stock to North Carolina residents. Since those corporations escape North Carolina's income tax to the extent those corporations do business in other States, the Secretary says, the State may require those companies to pay for the privilege of access to the State's capital markets by a tax on the value of the shares sold. So, the Secretary concludes, the intangibles tax "rests squarely on 'the settled principle that interstate commerce may be made to pay its way.'" Brief for Respondent 18 (quoting *Oregon Waste*, 511 U. S., at 102).

The argument is unconvincing, and we rejected a counterpart of it in *Oregon Waste*, where we held that Oregon could not charge an increased fee for disposal of waste generated out of state on the theory that in-state waste generators supported the cost of waste disposal facilities through general income taxes. Although we relied primarily upon the conclusion that earning income and disposing of waste are not "substantially equivalent taxable events," *id.*, at 105, we also spoke of the danger of treating general revenue measures as relevant intrastate burdens for purposes of the compensatory tax doctrine. "[P]ermitting discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds." *Id.*, at 105, n. 8 (internal quotation marks and citation omitted). We declined then, as we do now, "to open such an expansive loophole in our carefully confined compensatory tax jurisprudence." *Ibid.*

Even shutting our eyes to that loophole, we are unpersuaded that North Carolina's corporate income tax is designed to support the maintenance of an intrastate capital market. North Carolina, like most States, regulates access to its capital markets by means of blue sky laws, see generally N. C. Gen. Stat. ch. 78A (1994), and their accompanying regulations, which prescribe who may sell securities in North Carolina, the procedures that must be followed to do so, and the fees imposed for the privilege. See, *e. g.*, N. C. Gen. Stat. § 78A–28 (1994) (registration procedures and fees); 18 N. C. Admin. Code § 6.1304 (1990) (same). Absent probative evidence to the contrary, which the Secretary has not supplied, we can reasonably assume that North Carolina has provided for the upkeep of its capital market through these provisions, not through the general corporate income tax.[4]

If the corporate income tax does not support the maintenance of North Carolina's capital market, then the State has not justified imposition of a compensating levy on the ownership of shares in corporations not subject to the income tax. While we need not hold that a State may never justify a compensatory tax by an intrastate burden included in a general form of taxation, the linkage in this case between the intrastate burden and the benefit shared by out-of-staters is far too tenuous to overcome the risk posed by recognizing a general levy as a complementary twin.

### B

The second prong of our analysis requires that "the tax on interstate commerce . . . be shown roughly to approximate—but not exceed—the amount of the tax on intrastate commerce." *Oregon Waste, supra,* at 103. The Secretary ar-

---

[4] Our skepticism regarding the Secretary's capital markets argument is reinforced by the fact that the Secretary did not advance it to the state courts.

gues that the relative magnitudes of the corporate income tax and the intangibles tax can be evaluated best by reference to the price/earnings (P/E) ratios of taxpayer firms. This ratio represents the relationship of the value of a corporation's stock, the target of the intangibles tax, to the corporation's earnings, which are subjected to the income tax. See 3 New Palgrave Dictionary of Money & Finance 176 (1992). North Carolina taxes corporate income and ownership of stock at rates of 7.75% and .25%, respectively. Given these rates, the State Supreme Court found that "a North Carolina corporation need only have a P/E ratio less than 31 (7.75/.25) in order to have the tax against its income exceed the intangibles tax against the stockholders of a comparable corporation doing business only in [other States] and having all its shareholders in North Carolina. Since P/E ratios are only rarely greater than 31, most out-of-state corporations will in fact be paying less taxes to North Carolina . . . than a similar North Carolina corporation." 338 N. C., at 480, 450 S. E. 2d, at 733 (footnotes omitted).

The math is fine, but even leaving aside the issue of who is really paying the taxes, the example compares apples to oranges. When a corporation doing business in a State pays its general corporate income tax, it pays for a wide range of things: construction and maintenance of a transportation network, institutions that educate the work force, local police and fire protection, and so on. The Secretary's justification for the intangibles tax, however, rests on only one of the many services funded by the corporate income tax, the maintenance of a capital market for the shares of both foreign and domestic corporations. To the extent that corporations do their business outside North Carolina, after all, they get little else from the State. Even, then, if we suppressed our suspicion that North Carolina actually funds its capital market through its blue sky fees, not its general corporate taxation, the relevant comparison for our analysis has to be between the size of the intangibles tax and that of the cor-

porate income taxes component that purportedly funds the capital market.

That comparison, of course, is for the present practical purpose impossible. The corporate income tax is a general form of taxation, not assessed according to the taxpayer's use of particular services, and before its revenues are earmarked for particular purposes they have been commingled with funds from other sources. As a result, the Secretary cannot tell us what proportion of the corporate income tax goes to support the capital market, or whether that proportion represents a burden greater than the one imposed on interstate commerce by the intangibles tax. True, it is not inconceivable, however unlikely, that a capital markets component of the corporate income tax exceeds the intangibles tax in magnitude, but the Secretary cannot carry her burden of demonstrating this on the record in front of us.

This difficulty simply confirms our general unwillingness to "permi[t] discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation." *Oregon Waste*, 511 U. S., at 105, n. 8. Where general forms of taxation are involved, we ordinarily cannot even begin to make the sorts of quantitative assessments that the compensatory tax doctrine requires. See *infra*, at 341–343.

## C

The tax, finally, fails even the third prong of compensatory tax analysis, which requires the compensating taxes to fall on substantially equivalent events. Although we found such equivalence in the sales/use tax combination at issue in *Silas Mason*, our more recent cases have shown extreme reluctance to recognize new compensatory categories. In *Oregon Waste*, we even pointed out that "use taxes on products purchased out of state are the only taxes we have upheld in recent memory under the compensatory tax doctrine." 511 U. S., at 105. On the other hand, we have rejected equivalence arguments for pairing taxes upon the earning of in-

come and the disposing of waste, *ibid.*, the severance of natural resources from the soil and the use of resources imported from other States, *Maryland* v. *Louisiana*, 451 U. S., at 759, and the manufacturing and wholesaling of tangible goods, *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 244 (1987); *Armco Inc.* v. *Hardesty*, 467 U. S., at 642. In each case, we held that the paired activities were not "sufficiently similar in substance to serve as mutually exclusive prox[ies] for each other." *Oregon Waste, supra*, at 103 (internal quotation marks and citation omitted).

In the face of this trend, the Secretary argues that North Carolina has assured substantial equivalence by employing the same apportionment formula to tie the percentage of share value subject to the intangibles tax directly to the percentage of income earned within the State. See N. C. Gen. Stat. § 105–130.4(i) (1992). The Secretary further contends that the intangibles tax and the corporate income tax fall on substantially equivalent "events" because they fall on economically equivalent "values": the value of a corporation's stock and the value of a corporation's income, respectively. Even assuming the truth of both these assertions, however, we find that the intangibles tax is not functionally equivalent to the corporate income tax.

By equivalence of value, the Secretary means that the value reached by the intangibles tax reflects that targeted by the income tax to a substantial degree because of the influence of corporate earnings on the price of stock. While that may be true enough,[5] it does not explain away the fact

---

[5] It is generally well accepted that corporate income will ordinarily be a good indicator of the stock's value. See, *e. g.*, J. Weston & E. Brigham, Essentials of Managerial Finance 254–257 (10th ed. 1993). While there may be cases in which other factors will play a more significant role, and while the past corporate earnings that the income tax reaches may be an imperfect proxy for the anticipated future earnings upon which stock price is actually based, we are willing to accept the Secretary's judgment that the taxed values correspond for purposes of this case.

that the taxes are apparently different (quite apart from stated rates) in a number of obvious respects, including the parties ostensibly taxed. Something more than mere influence of the one stated tax base on the value of the other would therefore be necessary before we could conclude that equivalent events (or "values") are taxed. The nature of that something more flows from the objective of the equivalent-event requirement, which is to enable in-state and out-of-state businesses to compete on a footing of equality. In *Silas Mason*, for example, we observed that "[t]he practical effect" of Washington's sales/use tax regime "must be that retail sellers in Washington will be helped to compete upon terms of equality with retail dealers in other states who are exempt from a sales tax or any corresponding burden." 300 U. S., at 581; see also *Halliburton Oil Well Cementing Co.* v. *Reily*, 373 U. S. 64, 70 (1963) ("[E]qual treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state"). This equality of treatment does not appear when the allegedly compensating taxes fall respectively on taxpayers who are differently described, as, for example, resident shareholders and corporations doing business out of state. A State defending such a scheme as one of complementary taxation, therefore, has the burden of showing that the actual incidences of the two tax burdens are different enough from their nominal incidences so that the real taxpayers are within the same class, and that therefore a finding of combined neutrality on interstate competition would at least be possible.[6]

---

[6] *Silas Mason* makes clear that actual incidence upon the same class of taxpayers is a necessary condition for a finding that two taxes are complementary. Our analysis has sometimes focused upon other factors, however, see, *e. g., Armco Inc.* v. *Hardesty*, 467 U. S. 638, 643 (1984), and we need not decide today whether identity of tax incidence is *sufficient* to compel the conclusion that two taxes fall upon substantially equivalent events.

In principle, the door may be open for such an argument. It is well established that "the ultimate distribution of the burden of taxes [may] be quite different from the distribution of statutory liability," McLure, Incidence Analysis and the Supreme Court: An Examination of Four Cases from the 1980 Term, 1 Sup. Ct. Econ. Rev. 69, 72 (1982), with such divergence occurring when the nominal taxpayer can pass it through to other parties, like consumers. The Secretary's equivalence argument might work in the present case, then, if we could find that the economic impact of North Carolina's corporate income tax is passed through to shareholders of corporations doing business in state in a way that offsets the disincentive imposed by the intangibles tax to buying stock in corporations doing business out of state.

But there is a problem with this line of argument, and it lies in the frequently extreme complexity of economic incidence analysis. The actual incidence of a tax may depend on elasticities of supply and demand, the ability of producers and consumers to substitute one product for another, the structure of the relevant market, the timeframe over which the tax is imposed and evaluated, and so on. See, e. g., Commonwealth Edison Co. v. Montana, 453 U. S. 609, 619, n. 8 (1981) (determining "whether the tax burden is shifted out of State, rather than borne by in-state producers and consumers, would require complex factual inquiries about such issues as elasticity of demand for the product and alternative sources of supply").[7] We declined to shoulder any such analysis in Minneapolis Star & Tribune Co. v. Minnesota

---

[7] Other factors may also be important, depending on the particular case. These include "whether (1) the taxed product is a final or intermediate good, (2) the tax is large or small, (3) prices are rising or falling, (4) the costs of the taxed enterprise are increasing or decreasing, (5) the factors of production are mobile, (6) the taxed industry is subject to government regulation, and (7) in the federal system, the state imposing the tax dominates the market for the taxed good or service." Hellerstein, Complementary Taxes as a Defense to Unconstitutional State Tax Discrimination, 39 Tax Lawyer 405, 439 (1986).

*Comm'r of Revenue,* 460 U. S. 575, 589–590, and nn. 12–14 (1983), noting that "courts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation. The complexities of factual economic proof always present a certain potential for error, and courts have little familiarity with the process of evaluating the relative economic burden of taxes" (footnote omitted). We were likewise unwilling to "plunge . . . into the morass of weighing comparative tax burdens by comparing taxes on dissimilar events" in *Oregon Waste.* 511 U. S., at 105 (internal quotation marks omitted). Indeed, the general difficulty of comparing the economic incidence of state taxes paid by different taxpayers upon different transactions goes a long way toward explaining why we have so seldom recognized a valid compensatory tax outside the context of sales and use taxes.[8] See Hellerstein, Complementary Taxes as a Defense to Unconstitutional State Tax Discrimination, 39 Tax Law-

---

[8] The only exception of which we are aware is *Hinson* v. *Lott,* 8 Wall. 148 (1869). In that case, we upheld an Alabama tax on each gallon of liquor imported into the State on the ground that it complemented a tax of equal magnitude on each gallon of liquor distilled in the State. We noted that this tax scheme was "necessary to make the tax equal on all liquors sold in the State," *id.,* at 153, a rationale consistent with our conclusion that the compensatory tax doctrine is fundamentally concerned with equalizing competition between in-staters and out-of-staters. Indeed, we cited *Hinson* in support of a similar proposition in *Silas Mason.* See *Henneford* v. *Silas Mason,* 300 U. S. 577, 585 (1937). In determining that a tax on importers and distillers would actually equalize competition in the liquor market, the *Hinson* Court made a good commonsense estimate of the likely incidence of the two taxes. Simply because modern economic tools may indicate that the incidence question is more complex, moreover, does not undermine the basic principle of equal competition established in *Hinson.* By the same token, however, *Hinson* does not alter our conclusion today that courts will ordinarily be unable to evaluate the economic equivalence of allegedly complementary tax schemes that go beyond traditional sales/use taxes. See *supra,* at 337–338, this page and 343. So much for *Hinson* in theory; for *Hinson* in practice, compare it with *Armco, supra.*

yer 405, 434, n. 197, 458 (1986) (noting that sales and use taxes require no economic incidence analysis because they are strict functional equivalents for one another).

In this case, not only has the State failed to proffer any analysis addressing the complexity of its burden, but we have particular reason to doubt the Secretary's suggestion that domestic corporate income taxes are so reflected in the stock values of corporations doing business in state as to offset the effects of the intangibles tax. Because corporations operating in North Carolina do not exhaust the market for investment opportunities, investors are free to look elsewhere if North Carolina's corporate income tax has the effect of depressing the value of shares in corporations doing business in the State. Hence, the impact of the income tax will be reflected in the purchase price of these shares, investors will presumably earn a market return on a lower outlay, and the actual burden of the tax will be borne by other parties, such as the consumers of the corporations' products. See McClure, *supra*, at 82; see also McClure, The Elusive Incidence of the Corporate Income Tax: The State Case, 9 Pub. Finance Q. 395, 401 (1981). But because North Carolina investors make up a relatively small proportion of the participants in national capital markets, it is unlikely that the stock price of corporations doing business outside the State will reflect the impact of the intangibles tax. The economic incidence of this tax is thus likely to fall squarely on the shareholder. All other things being equal, then, a North Carolina investor will probably favor investment in corporations doing business within the State, and the intangibles tax will have worked an impermissible result. See *Halliburton*, 373 U. S., at 72 (States may not impose discriminatory taxes on interstate commerce in the hopes of encouraging firms to do business within the State); *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 356 (1951) (observing that the creation of "preferential trade areas" is "destructive of the very purpose of the Commerce Clause").

All other things, of course, are rarely equal, and investors may wish to invest in corporations doing business in North Carolina for any number of reasons, perhaps affecting the degree to which the corporate income tax is or is not passed through to shareholders. Our point, however, is simply that there are reasons to doubt the Secretary's contention that the corporate income tax amounts to a clear equivalent for the burden on shareholding imposed by the intangibles tax, and these doubts are dispositive. After all, "the concept of the compensatory tax . . . is merely a specific way of justifying a facially discriminatory tax as achieving a legitimate local purpose that cannot be achieved through nondiscriminatory means." *Oregon Waste, supra*, at 102. As with any other defense of a facially discriminatory tax, the State has the burden to show that the requirements of the compensatory tax doctrine are clearly met. Cf. *Chemical Waste Management, Inc.* v. *Hunt*, 504 U. S., at 342–343 (noting that "'facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose'") (quoting *Hughes* v. *Oklahoma*, 441 U. S. 322, 337 (1979)). While we doubt that such a showing can ever be made outside the limited confines of sales and use taxes, it is enough to say here that no such showing has been made.

## IV

Our finding that North Carolina has failed to show that its intangibles tax satisfies any of the three requirements for a valid compensatory tax leaves the tax unconstitutional as facially discriminatory under our modern tests. The Secretary argues, however, that our decision in *Darnell* v. *Indiana*, 226 U. S. 390 (1912), compels us to sustain the North Carolina statute. The statutory scheme at issue in *Darnell* taxed all shares in foreign corporations owned by Indiana residents as well as all shares in domestic corporations to the extent that the issuing corporations' property was not subject to Indiana's general property tax. Writing for the Court, Justice Holmes found that "[t]he only difference of

treatment . . . that concerns the defendants is that the State taxes the property of domestic corporations and the stock of foreign ones in similar cases." *Id.*, at 398. This arrangement, he concluded, "is consistent with substantial equality notwithstanding the technical differences." *Ibid.*[9]

Justice Holmes has been praised for the lucidity of his reasoning, as having been "wrong clearly" even where he erred, see Hart, Positivism and the Separation of Law and Morals, 71 Harv. L. Rev. 593 (1958), but the opinion in *Darnell* does not exemplify his customary merit. He gives no explanation for the conclusion quoted, commenting only that the discrimination issue "was decided in *Kidd* v. *Alabama*, 188 U. S. 730, 732 [(1903)]." 226 U. S., at 398. *Kidd*, however, was decided under the Equal Protection Clause of the Fourteenth Amendment and emphasized "the large latitude allowed to the States for classification upon any reasonable basis." 188 U. S., at 733 (citations omitted). The exclusive reliance upon *Kidd* in *Darnell* thus indicates that the latter case should be viewed primarily as one of equal protection, despite the fact that Indiana's shareholder tax was challenged under both the Equal Protection and Commerce Clauses.

To the extent that *Darnell* evaluated a discriminatory state tax under the Equal Protection Clause, time simply has passed it by. While we continue to measure the equal protection of economic legislation by a "rational basis" test, see, *e. g., FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313 (1993), we now understand the dormant Commerce Clause to require "justifications for discriminatory restrictions on commerce [to] pass the 'strictest scrutiny.'" *Oregon Waste*, 511 U. S., at 101 (quoting *Hughes* v. *Oklahoma, supra*, at 337); see also *Chemical Waste Management, Inc.*

---

[9] The Court did recognize as problematic the Indiana statute's failure to exempt shares of foreign corporations to the extent that those corporations owned, and were taxed upon, property within the State. Justice Holmes noted, however, that the petitioners lacked standing to raise that claim. 226 U. S., at 398.

v. *Hunt, supra,* at 342–343; *Philadelphia* v. *New Jersey,* 437
U. S. 617, 624 (1978).[10]   Hence, while cases like *Kidd* and
*Darnell* may still be authorities under the Equal Protection
Clause, they are no longer good law under the Commerce
Clause.   Cf. *Associated Industries of Mo.* v. *Lohman,* 511
U. S., at 652 (holding that, although a prior case applied a
more lenient equal protection analysis to a Commerce Clause
challenge, it had been "bypassed by later decisions").   North
Carolina's intangibles tax cannot pass muster under modern
compensatory tax cases, and *Darnell* cannot save it.

V

North Carolina's intangibles tax facially discriminates
against interstate commerce, it fails justification as a valid
compensatory tax, and, accordingly, it cannot stand.   At the
same time, of course, it is true that "a State found to have
imposed an impermissibly discriminatory tax retains flexi-
bility in responding to this determination." *McKesson
Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla.
Dept. of Business Regulation,* 496 U. S. 18, 39–40 (1990).   In
*McKesson,* for example, we said that a State might refund
the additional taxes imposed upon the victims of its discrimi-
nation or, to the extent consistent with other constitutional
provisions (notably due process), retroactively impose equal
burdens on the tax's former beneficiaries.   A State may also
combine these two approaches.   *Ibid.*   These options are
available because the Constitution requires only that "the
resultant tax actually assessed during the contested tax

---

[10] Cf., *e. g., Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522, 528 (1959)
("[I]t has long been settled that a [tax] classification, though discrimina-
tory, is not . . . violative of the Equal Protection Clause . . . if any state of
facts reasonably can be conceived that would sustain it").   One commenta-
tor has observed that, "[b]ecause the states enjoy extremely broad leeway
under the equal protection clause in drawing lines for tax purposes, they
normally have no need to defend a discriminatory tax classification on
the ground that a 'complementary' levy is imposed on other taxpayers."
Hellerstein, 39 Tax Lawyer, at 428 (footnote omitted).

period reflec[t] a scheme that does not discriminate against interstate commerce." *Id.*, at 41.[11]

In this case, that choice may well be dictated by the severability clause enacted as part of the intangibles tax statute. N. C. Gen. Stat. § 105–215 (1992). That issue, however, as well as the question whether Fulton has properly complied with the procedural requirements of North Carolina's tax refund statute, § 105–267, ought to come before the state courts in the first instance. Cf. *Swanson* v. *State*, 335 N. C. 674, 680–681, 441 S. E. 2d 537, 541 (noting that "[f]ailure to comply with the requirements in section 105–267 bars a taxpayer's action against the State for a refund of taxes"), cert. denied, 513 U. S. 1056 (1994).[12] Where "the federal constitutional issues involved [in the remedial determination] may well be intertwined with, or their consideration obviated by, issues of state law," our practice is to leave the remedy for the state supreme court to fashion on remand. *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 277 (1984); see also *Tyler Pipe Industries* v. *Dept. of Revenue*, 483 U. S., at 252; *Williams* v. *Vermont*, 472 U. S. 14, 28 (1985). We do that here.

The judgment of the North Carolina Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[11] We have also suggested that a " 'meaningful opportunity for taxpayers to withhold contested tax assessments and to challenge their validity in a predeprivation hearing' is itself sufficient to satisfy constitutional concerns." *Associated Industries*, 511 U. S., at 656 (quoting *McKesson*, 496 U. S., at 38, n. 21). The Secretary has not asserted that such an opportunity was afforded to Fulton under North Carolina's remedial scheme.

[12] The North Carolina Court of Appeals in this case did address the severability clause, holding that it required that the intangibles tax continue in effect without the taxable percentage deduction. *Fulton Corp.* v. *Justus*, 110 N. C. App. 493, 504, 430 S. E. 2d 494, 501 (1993). Because the North Carolina Supreme Court found the tax to be valid, however, it did not reach this question.

CHIEF JUSTICE REHNQUIST, concurring.

*Darnell* v. *Indiana,* 226 U. S. 390 (1912), required that taxation of interstate transactions be "consistent with substantial equality notwithstanding the technical differences." *Id.,* at 398. Whether or not North Carolina's intangibles tax would satisfy *Darnell*'s "substantial equality" requirement, I agree that the tax is not consistent with this Court's more recent requirement that there be "substantial equivalence" between an in-state taxable event and the interstate event on which a State levies a compensatory tax. *Ante,* at 345–346. I have expressed in dissent my belief that the "substantial equivalence" test deviates from the principle articulated in earlier cases that "'equality for the purposes of competition and the flow of commerce'" should be "'measured in dollars and cents, not legal abstractions,'" *Armco Inc.* v. *Hardesty,* 467 U. S. 638, 647 (1984) (quoting *Halliburton Oil Well Cementing Co.* v. *Reily,* 373 U. S. 64, 70 (1963)), and it might be argued accordingly that *Darnell* is more "realistic," 467 U. S., at 648. However, my view has not prevailed, and *Darnell* simply cannot be reconciled with the compensatory-tax decisions cited in the Court's opinion, *ante,* at 345–346. I therefore join the opinion of the Court.