Justice Kennedy, with whom Justice Alito joins,
dissenting.
Eighteenth-century thinkers, even those most prescient, could not foresee our technological and economic interdependence. Yet they understood its foundation. Free trade in the United States, unobstructed by state and local barriers, was indispensable if we were to unite to ensure the liberty and progress of the whole Nation and its people. This was the vision, and a primary objective, of the Framers of the Constitution. History, as we know, vindicates their judgment. The national, free market within our borders has been a singular force in shaping the consciousness and creating the reality that we are one in purpose and destiny. The Commerce Clause doctrine that emerged from the decisions of this Court has been appropriate and necessary to implement the Constitution’s purpose and design.
These general obsérvations are offered at the outset to underscore the imprudent risk the Court now creates by misinterpreting our precedents to decide this case. True, the majority opinion, wrong as it is, will not threaten the whole economy or national unity on these facts alone. The explicit, local discrimination the Court ratifies today likely will result in extra, though manageable, accommodation costs and can be welcomed by existing interests ready to profit from it. This market perhaps can absorb the costs of discrimination; our jurisprudence, unless the decision stands alone as an anomaly, cannot.
*363 Reactive institutions and adjusting forces — for instance mutual funds for state and municipal bonds issued within a single State — already are in place in response to the local protectionist laws here at issue and now in vogue. These mechanisms may allow the market, though necessarily distorted by deviation from essential constitutional principles, to continue to cope in a more or less efficient manner; and the damage likely will be limited to the discrete, and now distorted, market for state and municipal bonds. Many economists likely will find it unfortunate, and inefficient, that a specialized business has emerged to profit from a departure from constitutional principles. Even if today’s decision is welcomed by those who profit from the discrimination, the system as a whole would benefit from a return to a market with proper form, freed from artificial restraints. It does seem necessary, however, to point out the systemic consequences of today’s decision — if only to confine it and to discourage new experiments with local laws that discriminate against interstate commerce and trade.
The incorrect result the majority reaches; its treatment of the Commerce Clause cases in which our predecessors reached a delicate, sensible implementation of the Framers’ original purpose; and the unsatisfactory, brief, circular reasoning contained in the part of the opinion that commands a majority of the Court are all inconsistent with our precedents and require this respectful dissent.
Protectionist trade laws and policies, pursued to favor local interests within a larger trading area, invite prompt retaliatory response. This dynamic was one the Framers understood in theory and saw in fact. See, e.g., West Lynn Creamery, Inc. v. Healy, 512 U. S. 186, 193, n. 9 (1994). Under the Articles of Confederation the States enacted protectionist laws. It proved difficult and costly, even in terms of political energies, to remove trade barriers by negotiated agreements; and the few resulting compacts seemed destined to favor the more powerful States. The immediate prospect *364 of escalating trade barriers was real, and a national power to regulate national trade and remove local barriers soon was deemed urgent. Open markets and the elimination of trade barriers were the very concerns that led to the Annapolis Convention of 1786. See, e. g., E. Morgan, The Birth of the Republic, 1763-89, p. 129 (1956). The frustrations of that meeting built a strong consensus for the necessity of a larger compact and led to the call for the Philadelphia Convention. See, e. g., 1 S. Morison, H. Commager, & W. Leuchtenburg, The Growth of the American Republic 244 (rev. 6th ed. 1969). The object of creating free trade throughout a single nation, without protectionist state laws, was a dominant theme of the convention at Philadelphia and during the ratification debates that followed. See, e. g., The Federalist No. 22, pp. 143-144 (C. Rossiter ed. 1961) (A. Hamilton) (“It is indeed evident, on the most superficial view, that there is no object, either as it respects the interest of trade or finance, that more strongly demands a federal superintendence”).
This dissent will not repeat an earlier, brief account of our Commerce Clause jurisprudence. See United States v. Lopez, 514 U. S. 549, 568-583 (1995) (Kennedy, J., concurring). The cases from Gibbons v. Ogden, 9 Wheat. 1 (1824), to Willson v. Black Bird Creek Marsh Co., 2 Pet. 245 (1829), and then through Cooley v. Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots, 12 How. 299 (1852), began the elaboration of a rule respectful of local laws and local expertise, while preserving the theory and fact of free trade throughout the Nation. Though an oversimplification, it suffices here to note that our commerce cases have invalidated two types of local barriers: laws that impose unreasonable burdens upon interstate commerce; and laws that discriminate against it.
The doctrine invalidating laws that impose unreasonable burdens upon interstate commerce no doubt has been a deterrent to local enactments attempting to regulate in ways *365 that restrict a free, national market. The corollary rule that nondiscriminatory laws imposing a reasonable burden are valid allows the States to exercise their powers based on information and expertise more readily available to them than to the National Government. The result is to eliminate the demand and necessity for sweeping national legislation. This line of cases has found occasional detractors. See, e. g., CTS Corp. v. Dynamics Corp. of America, 481 U. S. 69, 95 (1987) (Scalia, J., concurring in part and concurring in judgment); Southern Pacific Co. v. Arizona ex rel. Sullivan, 325 U. S. 761, 790-795 (1945) (Black, J., dissenting). The undue burden rule, however, remains an essential safeguard against restrictive laws that might otherwise be in force for decades until Congress can act. Those cases were the background for the formulation used in Pike v. Bruce Church, Inc., 397 U. S. 137 (1970), which is in essence ignored by the decision in today’s case. See ante, at 353-356. The Court’s precedents discussing the undue burden principle, and Pike, need not be addressed here, however.
That is because the law in question is invalid under a second line of precedents. These cases instruct that laws with either the purpose or the effect of discriminating against interstate commerce to protect local trade are void. These are the authorities relevant to that portion of the opinion that commands a majority, see ante, at 341-343, and it is necessary to address the reasons the Court advances in seeking to disregard them.
I
The Court defends the Kentucky law by explaining that it serves a traditional government function and concerns the “cardinal civic responsibilities” of protecting health, safety, and welfare. See ante, at 342, and nn. 10-12. This is but a reformulation of the phrase “police power,” long abandoned as a mere tautology. It is difficult to identify any state law that has come before us that would not meet the Court’s description. That is why, with the unfortunate recent ex *366 ception of United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U. S. 330 (2007), the Court had ceased to view the concept as saying anything instructive. A law may contravene a provision of the Constitution even if enacted for a beneficial purpose.
The police power concept is simply a shorthand way of saying that a State is empowered to enact laws in the absence of constitutional constraints; but, of course, that only restates the question. That a law has the police power label — as all laws do — does not exempt it from Commerce Clause analysis. The Court said this in a case striking down an order, based upon local flood control needs, directing a railroad to remove certain bridges and raise others that supported rail lines involved in interstate commerce: “[A] State cannot avoid the operation of [the Commerce Clause] by simply invoking the convenient apologetics of the police power.” Kansas City Southern R. Co. v. Kaw Valley Drainage Dist., 233 U. S. 75, 79 (1914) (opinion for the Court by Holmes, J.).
The Court holds the Kentucky law is valid because bond issuance fulfills a governmental function: raising revenue for public projects. See ante, at 341-342. Aside from the point that this is but an extension of the police power (“this is a good law”) argument, the premise is wrong. The law in question operates on those who hold the bonds and trade them, not those who issue them. The bonds are not issued with a covenant promising tax exemption or tax relief to the holder. The bonds contain no such provision. The security is issued as a formal obligation to repay. Not a word in the terms and conditions of the securities promises favored tax treatment for certain holders. Indeed, that could not be done without impairing marketability. It is simply not commercial or investment practice to make payment obligations turn upon either the residence of the holder or the State of the issuer. The issuer intends to use the interstate market for its bonds and does not encumber them with conditions *367 giving premiums or penalties depending upon the residence of the holders.
Even if the Court were correct to say the relevant legal framework is bond issuance, not taxation of bonds already issued, its conclusion would be incorrect; for the discrimination against out-of-state commerce still would be too plain and prejudicial to be sustained. See, e. g., United Haulers, supra, at 369 (Alito, J., dissenting) (“[T]o the extent [the majority’s] holding rests on a distinction between ‘traditional’ governmental functions and their nontraditional counterparts, it cannot be reconciled with prior precedent” (citation omitted)). The insufficiency of the Court’s reasoning is even more apparent, however, because its own premise is incorrect. The challenged state activity is differential taxation, not bond issuance. The state tax provision at issue could be repealed tomorrow without altering or impairing a single obligation in the bonds. It is the tax that matters; and Kentucky gives favored tax treatment to some securities but not others depending solely upon the State of issuance, and it does so to disadvantage bonds from other States.
Our cases establish this rule: A State has no authority to use its taxing power to erect local barriers to out-of-state products or commodities. See, e. g., West Lynn, 512 U. S., at 193 (“The paradigmatic example of a law discriminating against interstate commerce is the protective tariff or customs duty, which taxes goods imported from other States, but does not tax similar products produced in State”). Nothing in our cases even begins to suggest this rule is inapplicable simply because the State uses a discriminatory tax to favor its own enterprise. The tax imposed here is an explicit discrimination against out-of-state issuances for admittéd protectionist purposes. It cannot be sustained unless the Court disavows the discrimination principle, one of the most important protections we have elaborated for the Nation’s interstate markets.
*368 The Court has ruled that protectionist, differential taxation with respect to securities sales is invalid. Boston Stock Exchange v. State Tax Comm'n, 429 U. S. 318 (1977). In that case the Court , considered the validity of a New York transfer tax on securities transactions. New York taxed out-of-state sales more heavily than in-state sales. The transactions in question were concluded on stock exchanges, such as the Boston Stock Exchange, located outside New York State. All conceded the transactions had sufficient contacts with New York so it could impose a tax; the question was the validity of a higher rate on transactions closed on exchanges located out of State. The Court’s unanimous opinion held that the discriminatory tax, designed to favor New York, was invalid. Id., at 328. “[I]n the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State.” Id., at 337.
The same was true of the discriminatory tax exemption in Bacchus Imports, Ltd. v. Dias, 468 U. S. 263 (1984), which the Court invalidated after observing that “as long as there is some competition between the locally produced exempt products and nonexempt products from outside the State, there is a discriminatory effect.” Id., at 271. This principle refutes the majority’s contention, see ante, at 342-343, that Kentucky’s bonds do not compete with other state or local government bonds. The relevant inquiry is not the purpose of a bond but whether the bond is a product that competes. The majority cannot establish that, from an investor’s standpoint, Kentucky’s bonds do not compete with bonds from other state or municipal governments. Indeed, that competition is why the bonds need the advantages the exemptions give them. Nothing in Bacchus suggested its holding was dependent upon the private nature of the favored competitors. Instead, in rejecting the argument that discriminatory taxation was justified because the goal was to promote local industry, the Court explained that the “determination *369 of constitutionality” does not depend upon “the benefited or the burdened party.” 468 U. S., at 273. This reasoning does not permit a different outcome when the State is the “benefited party.”
The Court had little difficulty in holding invalid a discriminatory tax in Fulton Corp. v. Faulkner, 516 U. S. 325 (1996). There North Carolina had devised a tax on intangibles that employed a deduction scheme favoring those who owned stock in local companies by, in effect, taxing at a higher rate those who owned stock in out-of-state companies. Id., at 327-328. The Fulton scheme favored “domestic corporations over their foreign competitors in raising capital among North Carolina residents and tend[ed], at least, to discourage domestic corporations from plying their trades in interstate commerce.” Id., at 333. The Court held the scheme invalid as contrary to the Commerce Clause. See id., at 347.
Differential taxation favoring local trade over interstate commerce poses serious threats to the national free market because the taxing power is at once so flexible and so potent. The Court’s differential tax cases are mentioned here at the outset because taxation is the issue; and discriminatory tax schemes are relatively rare, if only because they resemble tariffs — the “paradigmatic . . . law[s] discriminating against interstate commerce,” West Lynn, 512 U. S., at 193. See ibid. (“[T]ariffs against the products of other States are so patently unconstitutional that our eases reveal not a single attempt by any State to enact one. Instead, the cases are filled with state laws that aspire to reap some of the benefits of tariffs by other means”).
The precedents forbidding discriminatory taxes are a subset of a larger class of cases that invalidate other regulations that favor local interests. These cases, too, are inconsistent with the Court’s holding today. Bonds are commodities in interstate commerce, and in this respect consumers are entitled to choose them over local products just as with milk, Dean Milk Co. v. Madison, 340 U. S. 349 (1951); apples, Hunt *370 v. Washington State Apple Advertising Comm’n, 432 U. S. 333 (1977); solid waste for landfill, Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources, 504 U. S. 353 (1992); solid waste for transfer, C & A Carbone, Inc. v. Clarkstown, 511 U. S. 383 (1994); out-of-state waste, Philadelphia v. New Jersey, 437 U. S. 617 (1978); and ethanol, New Energy Co. of Ind. v. Limbach, 486 U. S. 269 (1988) (a differential tax case). Cases on export controls — though of less relevance here — provide further instruction for the simple proposition that the national market cannot be isolated for protectionist or local purposes. See, e.g., Hughes v. Oklahoma, 441 U. S. 322 (1979) (striking down a state law prohibiting the shipment of minnows out of State); New England Power Co. v. New Hampshire, 455 U. S. 331 (1982) (striking down a state law requiring the state utility commission’s permission before a utility could convey electricity out of State).
In that portion of the Court’s opinion that commands a majority the main point is that validation of Kentucky’s tax exemption follows from the Court’s opinion last Term in United Haulers. But that overlooks the argument that was central to the entire holding of United Haulers. There the Court concluded the ordinance applied equally to interstate and in-state commerce — and so it applied without differentiation between in-state and out-of-state commerce — because the government had monopolized the waste processing industry. See 550 U. S., at 334. Nondiscrimination, not just state involvement, was central to the rationale. That justification cannot be invoked here, for discrimination against out-of-state bonds is the whole purpose of the law in question. Kentucky has not monopolized the bond market or the municipal bond market. Kentucky has entered a competitive, nonmonopolized market and, to give its bonds a market advantage, has taxed out-of-state municipal bonds at a higher rate. The explicit rationale of the law is to differentiate between local and interstate commodities. This case *371 is not an extension of United Haulers; it is a rejection of its principal rationale — that in monopolizing the local market, the ordinance applied equally to interstate and local commerce.
The Court’s next argument is the police power argument, returning to the idea that revenue-raising is important for a State’s own essential projects. See ante, at 341-342. This argument has two major flaws. First, it is a replay of the circularity inherent in the police powers, health, safety, and welfare rhetoric. It is difficult to think of any law meeting with general approval that, assuming its validity in other respects, would fall outside the description that it is for the health, safety, and welfare of its citizens. Second, the argument ignores the fact that all protectionist laws, by definition, can be justified to further some local interest.
In a case with important parallels to this one the Court considered whether a property tax exemption available to charitable and benevolent organizations in Maine could have differential application in order to advantage camps that served primarily Maine residents as distinct from camps that served primarily out-of-state residents. See Camps New-found/Owatonna, Inc. v. Town of Harrison, 520 U. S. 564 (1997). The Court was explicit in rejecting the argument that profit and not-for-profit organizations should be treated differently with respect to Commerce Clause protection, id., at 584, despite the State’s special, historic concern for charitable assistance within its own borders. The Camps New-found analysis is applicable here: There is “no reason why the nonprofit character of an enterprise should exclude it from the coverage of either the affirmative or the negative aspect of the Commerce Clause.” Ibid. So, too, there is no reason the governmental character of the bond-issuing enterprise should exclude it from the coverage of the Commerce Clause.
The majority concludes its central framework by saying the market for Kentucky’s bonds is not similar to the market *372 for private issuers because it is the Commonwealth’s own discrete market. So, it says, Kentucky can discriminate if it chooses. Quite apart from the principle that discrimination in explicit terms, purpose, and effect should invalidate this law, the Court’s argument proceeds, again, from a wrong and circular premise. The argument that Kentucky bonds are in a discrete market has no basis in the record. Kentucky state and local bonds compete with other bonds, as any investor knows. Within the national bond market there is a discrete submarket for all state and municipal bonds because they are tax exempt under the Internal Revenue Code. See ante, at 332 (citing 26 U. S. C. § 103(a)). The Court, however, goes on to suggest that within this separate market there are 41 further discrete markets for bonds in each of the separate States that have laws like the one before the Court. Ante, at 342-343. This is wrong because it defines the market based upon sellers’ purposes rather than upon its investors’ purposes. The latter are the touchstone of market definition. The Court’s seller-based definition is at odds with our Commerce Clause jurisprudence. The question has never been what the beneficiary of the discriminatory law will do with that benefit; that question relates to the ends sought by the discriminatory means. See, e. g., Bacchus, 468 U. S., at 272-273; see also United Haulers, supra, at 366-367 (Alito, J., dissenting).
The issue in this case, then, cannot be resolved by determining what the issuer does with the proceeds. And to the extent the Court says there is a consumer preference for a State’s own bonds within its own borders, this makes the mistake of defining a market by first assuming the validity of the discriminatory law at issue. No precedent permits the Court to define a market in terms of the very law under challenge for protectionist purposes and effects. This double counting does not work. If the discriminatory barrier did not exist, then the national market for all state and mu *373 nicipal bonds would operate like other free, nationwide markets. The fact that the national market for tax-free state and municipal bonds is a discrete one serves only to reinforce the point that it should operate without local restriction.
That the people in each of 49 States that joined a brief in support of Kentucky are alleged to want the law is irrelevant. See ante, at 350. Protectionist interests always want the laws they pass, even if their fellow citizens bear the burden, for they are positioned to profit from the barrier. The circumstance that the residents choose to bear the costs of a protectionist measure (assuming this to be so even though entrenched interests are the usual source for the law) has been found by this Court to be quite irrelevant: “This argument, if accepted, would undermine almost every discriminatory tax case. State taxes are ordinarily paid by in-state businesses and consumers, yet if they discriminate against out-of-state products, they are unconstitutional.” West Lynn, 512 U. S., at 203; see also Bacchus, supra, at 272.
That 41 States have local protectionist laws similar to this one proves the necessity of allowing settled principles against discrimination to operate in an important national market. The Court seems proud to say that New York was the first to enact a protectionist exemption. See ante, at 335. That, too, simply underscores the importance of adhering to the rules against state trade discrimination. New York, as a great financial capital, likely had no trouble raising money for its own bonds, and so its exemption might have been thought to be an advantage in some respects. The exemption benefits wealthy, high-tax States, allowing those States to hoard capital that otherwise might travel to issuers who offer a more competitive deal in pretax dollars. See, e. g., Blumstein, Some Intersections of the Negative Commerce Clause and the New Federalism: The Case of Discriminatory State Income Tax Treatment of Out-of-State Tax-Exempt Bonds, 31 Vand. L. Rev. 473, 546 (1978).
*374 In the wake of one trade barrier, retaliatory measures follow, as the Framers well knew. The widespread nature of these particular trade barriers illustrates the standard dynamics of politics and economics, demonstrating once more the need to avoid validating this law as somehow in the States’ own interests. By misapplying the rationales of the controlling precedents, the Court invites further erosion of the Commerce Clause, which must remain as a deterrent to experiments designed to serve local interests at the expense of a national system.
The Court’s categorical approach would seem to allow States to discriminate against out-of-state, government bonds in other ways. Nothing in the Court’s rationale justifying this scheme would stop Kentucky from taxing interest on out-of-state bonds at a high rate, say 80%, simply to give its own bonds further advantage. High tax rates designed to make out-of-state interests less attractive are not unheard of in our cases. See, e. g., Fulton, 516 U. S., at 333. Today the Court upholds a scheme no different in kind from those patently unconstitutional schemes. Furthermore, the Court’s approach would permit a State to condition tax-free treatment of out-of-state bonds on reciprocal treatment in another State, see ante, at 335-336, n. 7 (citing, for example, Utah’s reciprocal tax-free treatment of States that do not tax Utah bonds), leading to the discrete market blocs the Constitution was designed to eliminate. These examples underscore the objections already noted.
II
In a part of the opinion joined only by a plurality the analysis concludes the differential taxation scheme is a sufficiently diluted regulatory scheme so that the market-participant exception applies. See ante, at 343-348. This needs little comment. It suffices to note that a “tax exemption is not the sort of direct state involvement in the market *375 that falls within the market-participation doctrine.” Camps Newfound, 520 U. S., at 593. This expansion of the market-participant exception, if it were unleashed by a majority of the Court, would be an open invitation to enact these kinds of discriminatory laws — laws that, until today, the Court has not upheld in even a single instance. Taxation is a quintessential act of regulation, not market participation. See, e. g., New Energy, 486 U. S., at 278 (“[I]t [is] clear that Ohio’s assessment and computation of its fuel sales tax, regardless of whether it produces a subsidy, cannot plausibly be analogized to the activity of a private purchaser”). And even in a case where a State is a paradigmatic market participant because it owns the asset itself, downstream restrictions that discriminate against interstate commerce are not permitted. See South-Central Timber Development, Inc. v. Wunnicke, 467 U. S. 82, 98 (1984) (plurality opinion) (“[Although the State may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant”).
Ill
Throughout the Court’s argument is the concern that, were this law to be invalidated, the national market for bonds would be disrupted. See ante, at 353-356. The concern is legitimate, but if it is to be the controlling rationale the Court should cast its decision in those terms. The Court could say there needs to be a sui generis exception, noting that the interstate discrimination has been entrenched in many States and for a considerable time. That rationale would prompt my own statement of disagreement as a matter of principle and economic consequences, but it would be preferable to a decision that misinterprets the Court’s precedents. Instead, today the Court weakens the preventative force of the Commerce Clause and invites other protectionist laws, thus risking further dislocations and market ineffi *376 ciencies based on the origin of products and commodities that should be traded nationwide and without local trade barriers.
For these reasons, in my view, the judgment of the Court of Appeals of Kentucky should be affirmed.