[No. B233773. Second Dist., Div. Eight. Aug. 28, 2012.]

FRANK CUTLER, Plaintiff and Appellant, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

COUNSEL

Reed Smith, Margaret M. Grignon, Mardiros H. Dakessian and Zareh A. Jaltorossian for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Paul D. Gifford, Assistant Attorney General, W. Dean Freeman, Felix E. Leatherwood and Stephen Lew, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**GRIMES, J.—**

### SUMMARY

The trial court upheld, against a commerce clause challenge (U.S. Const., art. I, § 8, cl. 3), the constitutionality of Revenue and Taxation Code provisions allowing an individual California taxpayer to defer capital gains on the sale of stock in a qualified small business if the taxpayer used the gain to purchase stock in another qualified small business. The deferral was available, however, only if the stock sold and purchased was issued by corporations that used 80 percent of their assets in the conduct of business in California and that maintained 80 percent of their payrolls in California. (Rev. & Tax. Code, § 18152.5, subds. (c)(2)(A), (e)(1)(A) & (9).)

Under the teaching of the high court in *Fulton Corp. v. Faulkner* (1996) 516 U.S. 325, 330 [133 L.Ed.2d 796, 116 S.Ct. 848] (*Fulton*), we are bound to and do conclude that, because the statute affords taxpayers a deferral for income received from the sale of stock in corporations maintaining assets and payroll in California, while no deferral is afforded for income from the sale of stock in corporations that maintain assets and payroll elsewhere, the deferral provision discriminates on its face on the basis of an interstate element in violation of the commerce clause. We therefore reverse the judgment.

## FACTS

Under federal law, an individual taxpayer's gain on the sale of qualified small business stock is not recognized if the taxpayer purchases stock in other qualified small businesses within 60 days. (26 U.S.C.S. § 1045.) California law specifies that this rollover provision does not apply to California's personal income tax (Rev. & Tax. Code, § 18038.4), but California has its own provisions for the deferral of gains on qualified small business stock.[1] (Rev. & Tax. Code, §§ 18038.5, 18152.5.) (All further statutory references are to the Revenue and Taxation Code unless otherwise specified.) California's provisions mirror the federal provisions in many ways,[2] but limit the incentive to gains on investments in small businesses based in California.[3] (§ 18152.5, subds. (c)(2)(A), (e)(1)(A) & (9).)

Specifically, classification as a qualified small business requires that "[a]t least 80 percent (by value) of the assets of the corporation [must be] used by the corporation in the active conduct of one or more qualified trades or businesses in California" (§ 18152.5, subd. (e)(1)(A)), and a corporation does not meet this requirement "for any period during which more than 20 percent of the corporation's total payroll expense is attributable to employment located outside of California" (*id.*, subd. (e)(9)).

In 1998, plaintiff Frank Cutler sold stock he had acquired in an Internet startup company (U.S. Web Corporation or US WEB) for $2,296,000. He used some of the proceeds to purchase stock in several other small businesses. However, the US WEB stock he sold did not meet the "active business requirements" of section 18152.5—that is, US WEB did *not* maintain 80 percent of its assets and payroll in California. (§ 18152.5, subds. (c)(2)(A), (e)(1)(A) & (9).) We will refer to this as the California property and payroll requirement.

---

[1] Revenue and Taxation Code section 18038.5 states in pertinent part.that: "In the case of any sale of qualified small business stock held by a taxpayer other than a corporation for more than six months . . . , gain from that sale shall be recognized only to the extent that the amount realized on that sale exceeds: [¶] (1) The cost of any qualified small business stock purchased by the taxpayer during the 60-day period beginning on the date of that sale . . . ." (§ 18038.5, subd. (a)(1).)

[2] Section 18152.5, subdivision (c) defines " 'qualified small business stock' " as "any stock in a C corporation which is originally issued after August 10, 1993," if "[a]s of the date of issuance, the corporation is a qualified small business," and "the stock is acquired by the taxpayer at its original issue," either in exchange for money or other property or as compensation for services provided to the corporation. (§ 18152.5, subd. (c)(1).)

[3] Section 18152.5, subdivision (c)(2)(A) specifies that stock in a corporation is not to be treated as qualified small business stock "unless, during substantially all of the taxpayer's holding period for the stock, the corporation meets the active business requirements of subdivision (e) and the corporation is a C corporation."

On his 1998 California tax return, plaintiff deferred that part of the gain from the sale of his US WEB stock that he invested in three other small businesses. In May 2004, the Franchise Tax Board (the Board) disallowed the gain deferral, stating in its notice of proposed assessment that US WEB stock was not qualified small business stock (and also that plaintiff did not substantiate other requirements concerning the replacement stock, including that the replacement stock was purchased within 60 days of the sale, the purchase price, and other items). Plaintiff filed a protest, asserting the US WEB stock met the requirements of section 18152.5 and, even if it did not, the statute was unconstitutional under the commerce clause because it unfairly discriminates against investors in companies which conduct a portion of their business outside the State of California. Plaintiff also asserted he had substantiated or could substantiate the statutory requirements for the replacement stock.

The Board denied plaintiff's protest and affirmed the proposed assessment in February 2007. Plaintiff appealed to the state Board of Equalization, and in July 2009, plaintiff paid $442,000 to the state, equivalent to the tax, penalties and interest assessed by the Board. The state Board of Equalization denied plaintiff's appeal and sustained the Board's action.

Plaintiff filed this action for a refund in September 2009, claiming that the California property and payroll requirement violates the commerce clause because it discriminates on its face against interstate commerce, and that the due process clause of the 14th Amendment requires a full refund. Plaintiff filed a motion for summary adjudication, seeking a ruling declaring the California property and payroll requirement to be unconstitutional and awarding him a refund. The Board filed its own motion for summary judgment, contending both that the California property and payroll requirement was constitutional and that plaintiff failed to show his gain on the sales of the US WEB stock could otherwise be deferred. The parties stipulated to basic facts about the sale and purchase of the small business stock, the amount of taxes plaintiff paid, and the Board's denial of a refund. The Board argued there remained material disputes as to whether plaintiff qualified for the tax deferral under provisions other than the California property and payroll requirement.

The trial court denied plaintiff's motion and granted the Board's motion, concluding the California property and payroll requirement was not unconstitutional. Because plaintiff conceded he could not demonstrate the stock transactions at issue met that requirement, it was unnecessary for the trial court to decide the other issues presented in the parties' motions. Judgment was entered in favor of the Board and plaintiff appealed.

## DISCUSSION

The issue of the constitutionality of the California property and payroll requirement is one of law and our review is de novo.

### 1. The Legal Background

■ The United States Supreme Court has stated many times the principles applicable to a claim that state regulation—or state taxation—violates the commerce clause (U.S. Const., art. I, § 8, cl. 3). The commerce clause is phrased as a grant of regulatory power to Congress, but it "has long been seen as a limitation on state regulatory powers, as well as an affirmative grant of congressional authority." (*Fulton, supra,* 516 U.S. at p. 330.) *Fulton* tells us that in this negative aspect—also referred to as the dormant commerce clause—the clause " 'prohibits economic protectionism—that is, "regulatory measures designed to benefit instate economic interests by burdening out-of-state competitors." ' " (516 U.S. at p. 330.) This construction furthers "the Framers' purpose to 'prevent a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.' " (*Id.* at pp. 330–331.)

· The first step in evaluating a state regulatory measure under the dormant commerce clause is " 'to determine whether it "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." ' " (*Fulton, supra,* 516 U.S. at p. 331.) A law is discriminatory "if it ' "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." ' " (*Ibid.;* see *Boston Stock Exchange v. State Tax Comm'n* (1977) 429 U.S. 318, 332, fn. 12 [50 L.Ed.2d 514, 97 S.Ct. 599] (*Boston Stock Exchange*) [a state "may not discriminate between transactions on the basis of some interstate element"].) "State laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.' " (*Fulton,* at p. 331.)

■ "[T]he purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." (*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.* (1994) 511 U.S. 93, 100 [128 L.Ed.2d 13, 114 S.Ct. 1345] (*Oregon Waste*).) When a law discriminates against interstate commerce, "the virtually *per se* rule of invalidity provides the proper legal standard" and the law must be invalidated unless the state can " 'show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' " (*Id.* at pp. 100–101; see *Maine v. Taylor* (1986) 477 U.S. 131, 148 [91 L.Ed.2d 110,

106 S.Ct. 2440] ["[s]hielding in-state industries from out-of-state competition is almost never a legitimate local purpose"].) " '[J]ustifications for discriminatory restrictions on commerce [must] pass the "strictest scrutiny." ' " (*Fulton, supra,* 516 U.S. at p. 345.) "The State's burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.' " (*Oregon Waste,* at p. 101; see *New Energy Co. of Indiana v. Limbach* (1988) 486 U.S. 269, 274 [100 L.Ed.2d 302, 108 S.Ct. 1803] (*New Energy*) [state statutes that clearly discriminate against interstate commerce are routinely struck down "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism"].)

■ There are some exceptions to the rule that a facially discriminatory tax cannot stand. "[A] facially discriminatory tax may still survive Commerce Clause scrutiny if it is a truly ' "compensatory tax" designed simply to make interstate commerce bear a burden already borne by intrastate commerce.' " (*Fulton, supra,* 516 U.S. at p. 331.) This occurs most often with the imposition of use taxes which exempt the use of articles that have already been subjected to a sales tax equal to or greater than the use tax. Although such a use tax is facially discriminatory, "the combined effect of the sales and use taxes [is] to subject intrastate and interstate commerce to equivalent burdens," so there is no commerce clause violation. (516 U.S. at p. 332.)

Another exception is the "market participation" exception, which "covers States that go beyond regulation and themselves 'participat[e] in the market' so as to 'exercis[e] the right to favor [their] own citizens over others.' " (*Department of Revenue of Ky. v. Davis* (2008) 553 U.S. 328, 339 [170 L.Ed.2d 685, 128 S.Ct. 1801] (*Davis*); see *id.* at pp. 331–332 [differential tax scheme under which state exempts interest on its own bonds from state income taxes, which are imposed on bond interest from other states, does not offend the commerce clause]; see also *White v. Mass. Council of Constr. Employers* (1983) 460 U.S. 204, 208 [75 L.Ed.2d 1, 103 S.Ct. 1042] ["when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause"].)

2. *High Court and California Precedents*

■ Both the high court and California courts have addressed challenges to various kinds of state taxation laws on dormant commerce clause grounds. While the high court tells us that states may "structur[e] their tax systems to encourage the growth and development of intrastate commerce and industry," the court attaches the fundamental caveat that those structures may not "discriminatorily tax the products manufactured or the business operations performed in any other State." (*Boston Stock Exchange, supra,* 429 U.S. at pp. 336–337; see *Bacchus Imports, Ltd. v. Dias* (1984) 468 U.S. 263, 271

[82 L.Ed.2d 200, 104 S.Ct. 3049] (*Bacchus*) [states may enact laws with the purpose and effect of encouraging domestic industry, but "the Commerce Clause stands as a limitation on the means by which a State can constitutionally seek to achieve that goal"]; *Oregon Waste, supra*, 511 U.S. at p. 108 [states have "broad discretion to configure their systems of taxation as they deem appropriate," but that discretion "is bounded by . . . the negative Commerce Clause"].)

Some examples of tax statutes that have been found to violate the commerce clause may be instructive.

In *Boston Stock Exchange*, the high court found New York's transfer tax on securities transactions violated the commerce clause, where transactions involving an out-of-state sale were taxed more heavily than most transactions involving a sale within the state. (*Boston Stock Exchange, supra*, 429 U.S. at p. 319; *id.* at pp. 334–335 ["A State may no more use discriminatory taxes to assure that nonresidents direct their commerce to businesses within the State than to assure that residents trade only in intrastate commerce."].)

In *Bacchus*, the court found that an exemption from Hawaii's excise tax on sales of liquor at wholesale, for certain locally produced alcoholic beverages, discriminated against interstate commerce. (*Bacchus, supra*, 468 U.S. at pp. 273, 268, fn. 8, 269 [exemption violated the commerce clause "because it had both the purpose and effect of discriminating in favor of local products"; "discrimination between in-state and out-of-state goods is as offensive to the Commerce Clause as discrimination between in-state and out-of-state taxpayers"; small volume and lack of present competitive threat were not dispositive of whether competition existed between locally produced and foreign beverages and it was "well settled that '[we] need not know how unequal the Tax is before concluding that it unconstitutionally discriminates' "].)

In *Armco Inc. v. Hardesty* (1984) 467 U.S. 638 [81 L.Ed.2d 540, 104 S.Ct. 2620], the court found that West Virginia's gross receipts tax on persons selling tangible property at wholesale, from which local manufacturers were exempt, discriminated against interstate commerce. (*Id.* at pp. 641, 644 ["A tax that unfairly apportions income from other States is a form of discrimination against interstate commerce."].)

In *New Energy*, the court invalidated a tax credit (against the Ohio sales tax on fuel) for ethanol sold by fuel dealers, where the credit applied only if the ethanol was produced in Ohio (or a state granting similar tax advantages to ethanol produced in Ohio). (*New Energy, supra*, 486 U.S. at p. 271; *id.* at p. 278 ["The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that

description *in connection with the State's regulation of interstate commerce.* Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition; discriminatory taxation of out-of-state manufacturers does."].)

In *Oregon Waste*, the high court invalidated an Oregon surcharge on the in-state disposal of solid waste generated in other states that was three times as high as the surcharge imposed on waste generated in Oregon, finding it "patently discriminatory." (*Oregon Waste, supra*, 511 U.S. at pp. 106, fn. 9, 108; *id.* at p. 99 ["As we use the term here, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."].)

In *Fulton*, the high court invalidated North Carolina's " 'intangibles tax' " on a fraction of the value of corporate stock owned by North Carolina residents, a tax that was inversely proportional to the corporation's exposure to the state's income tax. (*Fulton, supra*, 516 U.S. at p. 327.) The tax was assessed at a stated rate, but residents "were entitled to calculate their tax liability by taking a taxable percentage deduction equal to the fraction of the issuing corporation's income subject to tax in North Carolina." (*Id.* at pp. 327–328.) So, stock in a corporation doing no business in North Carolina would be taxable on 100 percent of its value, and stock in a corporation doing all its business in North Carolina (and thus subject to corporate income tax on all of its income) would not be taxed at all (as the taxable percentage deduction allowed to resident owners of that corporation would be 100 percent). (*Id.* at p. 328.)

The *Fulton* court held: "There is no doubt that the intangibles tax facially discriminates against interstate commerce. *A regime that taxes stock only to the degree that its issuing corporation participates in interstate commerce favors domestic corporations over their foreign competitors in raising capital among North Carolina residents and tends, at least, to discourage domestic corporations from plying their trades in interstate commerce.*" (*Fulton, supra*, 516 U.S. at p. 333, italics added.) The only issue in *Fulton*, the high court said, was whether the tax could be sustained as a compensatory tax, " 'designed . . . to make interstate commerce bear a burden already borne by intrastate commerce' " (*id.* at p. 331), and the court found it could not. Notably, in its discussion of the state's compensatory tax defense (which is not an issue in this case), the *Fulton* court referred to "the disincentive imposed by the intangibles tax to buying stock in corporations doing business out of state" (*id.* at p. 341) and observed: "All other things being equal, then, a North Carolina investor will probably favor investment in corporations doing business within the State, and the intangibles tax will have worked an impermissible result" (*id.* at p. 343).

In *Camps Newfound/Owatonna, Inc. v. Town of Harrison* (1997) 520 U.S. 564 [137 L.Ed.2d 852, 117 S.Ct. 1590] (*Camps Newfound*), the court found that an exemption from state property tax for property owned by charitable institutions, which excluded from the exemption organizations operated principally for the benefit of nonresidents, violated the commerce clause. (520 U.S. at pp. 572, 576 ["As a practical matter, the statute encourages affected entities to limit their out-of-state clientele, and penalizes the principally nonresident customers of businesses catering to a primarily interstate market."].) The court recognized that "the discriminatory burden is imposed on the out-of-state customer indirectly by means of a tax on the entity transacting business with the non-Maine customer," but "[t]his distinction makes no analytic difference." (*Id.* at p. 580 [" 'imposition of a differential burden on any part of the stream of commerce—from wholesaler to retailer to consumer—is invalid, because a burden placed at any point will result in a disadvantage to the out-of-state producer' "].) And, "the statute provides a strong incentive for affected entities not to do business with nonresidents if they are able to so avoid the discriminatory tax. In this way, the statute is similar to the North Carolina 'intangibles tax' that we struck down in *Fulton* . . . ." (*Id.* at p. 578.)

As the *Camps Newfound* court further stated, "That the tax discrimination comes in the form of a deprivation of a generally available tax benefit, rather than a specific penalty on the activity itself, is of no moment" (*Camps Newfound, supra,* 520 U.S. at pp. 578–579), and "there is no ' "*de minimis*" defense to a charge of discriminatory taxation under the Commerce Clause' " (*id.* at p. 581, fn. 15). In rejecting the state's contention that tax exemptions for not-for-profit entities should be treated differently under the commerce clause, the court observed: "[I]f we view the issue solely from the State's perspective, *it is equally reasonable to use discriminatory tax exemptions as a means of encouraging the growth of local trade.* But as our cases clearly hold, such exemptions are impermissible." (520 U.S. at p. 588 ["Protectionism . . . is forbidden under the dormant Commerce Clause."].)

Two California cases decided after *Fulton* have invalidated California tax statutes under the dormant commerce clause.

In *Ceridian Corp. v. Franchise Tax Bd.* (2000) 85 Cal.App.4th 875 [102 Cal.Rptr.2d 611] (*Ceridian*), the First District held that a corporate tax deduction, for dividends paid to the corporation from the corporation's insurance company subsidiaries, violated the commerce clause because the deduction was limited to dividends paid from income from California sources. In that case, the Board "essentially concede[d]" that a provision allowing only corporations " 'commercially domiciled' " in California to deduct the insurance company dividends from their taxable income violated

the commerce clause. (*Ceridian, supra*, 85 Cal.App.4th at p. 883.) The court, following *Fulton*, found the statute (former § 24410) "unquestionably" discriminatory on its face: "[A] statutory scheme . . . that disallows a deduction based on the amount of *property and employees* that the dividend-declaring insurer has in another state, favors domestic corporations over their foreign competitors in raising capital among California corporations, and tends, at least, to discourage domestic corporations from plying their trade in interstate commerce, from purchasing property or hiring employees in other states, and from purchasing subsidiary insurance corporations that do so." (*Ceridian*, at p. 887.)

*Ceridian* observed that if a statute discriminates against interstate commerce, it is "virtually per se invalid *unless* it is a component of a valid 'compensatory tax' " (a contention disclaimed by the state), and that "[t]he fact that the tax scheme may serve some other laudatory purpose does not save it from a commerce clause challenge." (*Ceridian, supra*, 85 Cal.App.4th at p. 886.) *Ceridian* concluded: "Just as in *Fulton*, here the state imposes a tax based on value derived from ownership of a corporation. Just as North Carolina reduced its intangibles tax in direct proportion to the amount of business the owned corporation did within the state's borders, so too California reduces the dividend tax to the extent such dividends are 'paid from income from California sources,' [citation], which is calculated based on the proportionate amount of property, payroll and gross receipts the owned corporation has within California. [*Fulton*] prohibits such discriminatory treatment." (*Ceridian*, 85 Cal.App.4th at p. 887.)

In *Farmer Bros. Co. v. Franchise Tax Bd.* (2003) 108 Cal.App.4th 976 [134 Cal.Rptr.2d 390] (*Farmer Bros.*) this district followed *Fulton* and *Ceridian*, and invalidated a statute (a previous version of section 24402) that afforded corporate taxpayers a deduction for dividends received from corporations subject to tax in California, while affording *no* deduction for dividends received from corporations *not* subject to tax in California. The court found the statute discriminatory on its face, observing that "the dividends received deduction scheme favors dividend-paying corporations doing business in California and paying California taxes over dividend-paying corporations which do not do business in California and pay no taxes in California. The deduction thus discriminates between transactions on the basis of an interstate element, which is facially discriminatory under the commerce clause." (*Farmer Bros.*, at pp. 986–987.)

*Farmer Bros.* also rejected the Board's claim that the statute comported with the " 'internal consistency doctrine,' " a rule sometimes used to assess whether a tax is discriminatory. (*Farmer Bros., supra*, 108 Cal.App.4th at p. 988.) That doctrine requires a tax to have " 'internal consistency—that is

the [tax] must be such that, if applied by every jurisdiction,' there would be no impermissible interference with free trade." (*Armco Inc. v. Hardesty, supra,* 467 U.S. at p. 644.) In *Farmer Bros.,* the dividend received deduction violated the internal consistency doctrine because the imposition of the deduction by every state "would favor intrastate commerce over interstate commerce by giving a greater tax benefit to taxpayers investing in their home state corporations as opposed to out-of-state corporations or corporations engaged in multistate business." (*Farmer Bros.,* at p. 989.) The court also found that the Board had failed to justify the dividends received deduction as a compensatory tax (*id.* at pp. 989–993) and concluded: "As [the Board] fails to justify section 24402 as a compensatory tax, and it impermissibly discriminates against interstate commerce, the statute violates the commerce clause" (*id.* at p. 993).

### 3. *This Case*

■ There are obvious differences in the discriminatory tax schemes invalidated in the cases we have just discussed, and the tax scheme at issue in this case. Here, the tax benefit provided in section 18152.5 on the exchange of qualified small business stock is a deferral of taxation, rather than an outright exemption or deduction. The deferral of taxation occurs in connection with a sale (and subsequent purchase) of qualified small business stock, rather than in connection with dividends on the stock, and the deferral of gain is provided only for individual taxpayers, not for corporations. But we are unable to see how these distinctions could in any way sustain a departure from the analysis—and the conclusion—dictated by *Fulton* and the body of commerce clause jurisprudence that preceded and followed *Fulton.* The fact remains that the purpose and effect of the statute is, as *Fulton* forbids, to "favor investment in corporations doing business within the State" (*Fulton, supra,* 516 U.S. at p. 343), and the statute operates as a "disincentive . . . to buying stock in corporations doing business out of state" (*id.* at p. 341). As in *Fulton,* the statute "favors domestic corporations over their foreign competitors in raising capital among [California] residents and tends, at least, to discourage domestic corporations from plying their trades in interstate commerce." (*Id.* at p. 333.)

■ The Board insists the California property and payroll requirement does not discriminate against interstate commerce. But it offers no cogent analysis to support its assertion. The Board points out that the California property and payroll requirement does not tax products manufactured or business operations performed out of state, and that the requirement is "intended to allow California start-ups to compete for a share of interstate commerce." But as we have seen, a tax provision may be discriminatory without directly taxing out-of-state goods or services; *Fulton* itself involved a

tax on stock held by North Carolina residents and is analytically indistinguishable from this case. And the high court has made it clear that the state's purpose has no bearing on the question whether a law is facially discriminatory. (*Oregon Waste, supra*, 511 U.S. at p. 100; see *Bacchus, supra*, 468 U.S. at p. 273.)

The Board views the *Davis* case, where the high court upheld a differential tax scheme under which Kentucky—like 41 other states—exempts interest on its own bonds from state income taxes that are imposed on bond interest from other states, as "[p]articularly pertinent." (*Davis, supra*, 553 U.S. 328.) The Board contends the principles enunciated in *Davis* support the validity of the California property and payroll requirement, because California "is effectively using its tax system as an economic development agency to compete with other private entities and states for the limited pool of investment dollars." This argument too is without merit.

The Board misreads *Davis*, which upheld Kentucky's exemption on interest on its own bonds based on the "market participation" doctrine, a critical element of which was the state's participation in the bond market. (See *Davis, supra*, 553 U.S. at p. 339 [when a state enters the market as a participant, " 'it is not subject to the restraints of the Commerce Clause' "].) Davis explains that a government function (in *Davis*, issuance of debt securities to pay for public projects) "is not susceptible to standard dormant Commerce Clause scrutiny owing to its likely motivation by legitimate objectives distinct from the simple economic protectionism the Clause abhors." (*Id.* at p. 341.) Further, the Kentucky tax " 'benefit[s] a clearly public [issuer, that is, Kentucky], while treating all private [issuers] exactly the same.' " (*Id.* at p. 343.) Thus, "Kentucky's tax exemption favors a traditional government function without any differential treatment favoring local entities over substantially similar out-of-state interests," and does not discriminate against interstate commerce for purposes of the dormant commerce clause. (553 U.S. at p. 343.)

*Davis* acknowledged that Kentucky acted "in two roles at once, issuing bonds and setting taxes," but that "imposing the differential tax scheme makes sense only because Kentucky is also a bond issuer." (*Davis, supra*, 553 U.S. at p. 344.) "[W]hen Kentucky exempts its bond interest, it is competing in the market for limited investment dollars, alongside private bond issuers and its sister States, and its tax structure is one of the tools of competition." (*Id.* at pp. 345, 347 ["in the paradigm of unconstitutional discrimination the law chills interstate activity by creating a commercial advantage for goods or services marketed by local private actors, not by governments and those they employ to fulfill their civic objectives . . ."].) So, *Davis* concluded, "our cases on market regulation without market participation prescribe standard dormant Commerce Clause analysis; our cases on

market participation joined with regulation . . . prescribe exceptional treatment for this direct governmental activity in commercial markets for the public's benefit." (*Id.* at pp. 347–348; see *id.* at p. 348, fn. 17 [in *Camps Newfound, supra,* 520 U.S. at p. 593, "[w]e correctly rejected the argument that a tax exemption without more constitutes market participation"].)

So, the *Davis* rationale provides no support for the Board's position. Nor do the Board's other arguments. The Board points out that the California property and payroll requirement applies to individuals only and "would not affect out-of-state persons because they would not ordinarily be subject to tax in California." *Fulton* answers this claim: *Fulton* invalidated a tax on stock held by in-state (North Carolina) residents, and the illegality of the tax was reflected in the fact that "a North Carolina investor will probably favor investment in corporations doing business within the State, and the intangibles tax will have worked an impermissible result." (*Fulton, supra,* 516 U.S. at p. 343.)

■ The Board also points out that qualified small business corporations can "freely engage in interstate commerce" (so long as they maintain 80 percent of their assets and payrolls in California), the deferral does not depend on "the amount of in-state sales," is not reduced by "the amount of out-of-state sales," and is not "in any way based on income earned . . . in California." While correct, these facts are simply not dispositive of the question whether the deferral discriminates on its face against interstate commerce. Of course tax benefits conditioned on the amount of a corporation's in-state sales may well run afoul of the commerce clause, but that is not the test for discrimination under the commerce clause. A burden on interstate commerce may be imposed indirectly (*Camps Newfound, supra,* 520 U.S. at p. 580), and " 'a burden placed at any point [in the stream of commerce] will result in a disadvantage to the out-of-state producer' " (*ibid.*). The rule is that a state "may not discriminate between transactions on the basis of some interstate element" (*Boston Stock Exchange, supra,* 429 U.S. at p. 332, fn. 12), and that is what the California property and payroll requirement does. ■ As in *Fulton,* we cannot avoid the conclusion that the deferral statute "favors domestic corporations"—here, corporations with 80 percent of their assets and payrolls in California—"over their foreign competitors in raising capital among [California] residents and tends, at least, to discourage domestic corporations from plying their trades in interstate commerce." (*Fulton, supra,* 516 U.S. at p. 333.) The statute is discriminatory on its face and cannot stand under the commerce clause.

### 4.  *The Remedy*

Having granted the Board's motion on the ground the California property and payroll requirement of section 18152.5 was constitutional, the trial court

did not resolve the other issues raised in the Board's motion. These included the Board's claim that the stock plaintiff purchased did not meet other requirements for qualified small business stock separate from the California property and payroll requirement because plaintiff failed to provide documentation showing the number of shares sold, dates of sale and purchase of replacement stock, type of stock involved, and purchase price (and plaintiff's responding contention that the Board had not contested at the administrative level that the transactions all involved qualified small business stock). At the hearing on the motions, plaintiff's counsel and the Board's counsel both argued the Board's motion presented material disputed facts as to whether plaintiff qualified for the tax deferral apart from the California property and payroll requirement. The court agreed, identifying, among others, material disputes over who bought the stock, whether it was held for the requisite period, what were the purchase and sale prices for purposes of calculating the gain, whether the replacement stock qualified for the deferral, and the amount of any refund to which plaintiff might be entitled.

Plaintiff asks us to hold that a refund is the only proper remedy in this case, under the authority of *McKesson Corp. v. Florida Alcohol & Tobacco Div.* (1990) 496 U.S. 18 [110 L.Ed.2d 17, 110 S.Ct. 2238] (*McKesson*). In *McKesson*, the high court held that "[i]f a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation." (*McKesson, supra,* 496 U.S. at p. 31, fn. omitted.) *McKesson* identified three ways to provide the " 'clear and certain remedy' " required for an unlawful tax collection. (*Id.* at p. 39.) These were (1) "refunding to petitioner the difference between the tax it paid and the tax it would have been assessed were it extended the same rate reductions that its competitors actually received"; (2) "assess[ing] and collect[ing] back taxes from petitioner's competitors who benefited from the rate reductions during the contested tax period"; and (3) "a combination of a partial refund to petitioner and a partial retroactive assessment of tax increases on favored competitors, so long as the resultant tax actually assessed during the contested tax period reflects a scheme that does not discriminate against interstate commerce . . . ." (*Id.* at pp. 40–41.) In this case the statute of limitations prevents the state from collecting additional taxes from other taxpayers who benefited from the unconstitutional deferral provision.

The Board asserts that *McKesson* does not apply for various reasons, including that the statute in this case involves a tax deferral or exclusion "and not the imposition of a tax"; and that plaintiff was a "passive investor," not someone actually engaged in interstate commerce who was placed at a competitive disadvantage (whereas in *McKesson*, the taxpayer was a liquor

distributor put at a competitive disadvantage by a tax favoring distributors of in-state products). The Board also asserts that plaintiff is not entitled to a refund because he has not yet established that his sales and purchases met the statutory requirements for qualified small business stock under provisions other than the California property and payroll requirement.

With the material disputed facts in the record before us, we cannot determine whether plaintiff is entitled to a refund under the qualified small business stock provisions that are not the subject of this appeal. Since we cannot decide the amount of refund, if any, to which plaintiff may be entitled, we see no reason to opine on the appropriate remedy in a case where it has not yet been established that plaintiff is entitled to any remedy.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court for further proceedings. Plaintiff shall recover his costs on appeal.

Bigelow, P. J., and Flier, J., concurred.