Filed 9/2/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FRANK CUTLER, | B248270 |
| Plaintiff and Appellant, | (Los Angeles County |
| v. | Super. Ct. No. BC421864) |
| FRANCHISE TAX BOARD, | |
| Defendant and Respondent. | |

 

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Elizabeth A. White, Judge.  Reversed and remanded.

Reed Smith, Mardiros H. Dakessian, Margaret M. Grignon, Zareh A. Jaltorossian and Kasey J. Curtis for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Paul D. Gifford, Assistant Attorney General, W. Dean Freeman, Diane Spencer Shaw and Marta L. Smith, Deputy Attorneys General, for Defendant and Respondent.

_____

## SUMMARY

In 2012, we held in an earlier appeal in this case that a tax statute discriminated on its face on the basis of an interstate element in violation of the commerce clause. (*Cutler v. Franchise Tax Board* (2012) 208 Cal.App.4th 1247 (*Cutler I*).) When plaintiff Frank Cutler sought attorney fees under Code of Civil Procedure section 1021.5, the "private attorney general" attorney fee statute (section 1021.5), the trial court denied his application. The court concluded plaintiff's lawsuit did not meet two statutory prerequisites: first, it did not confer "a significant benefit, whether pecuniary or nonpecuniary, . . . on the general public or a large class of persons," and second, the "necessity and financial burden of private enforcement" were not "such as to make the award appropriate . . . ." (§ 1021.5.)

On the first point, the trial court found it was "speculative" that the lawsuit conferred any benefit on the general public or a large class of people. On the second point, the court found an award was not appropriate because plaintiff sought a refund of "a significant sum of money" ($442,000), so – even though he incurred attorney fees of more than $685,000 – he had an incentive to bring the litigation, and any benefit he conferred on the public was incidental.

We conclude the court erred on both points. We reverse the order denying attorney fees and remand for a determination of the amount of fees to be awarded.

## FACTS

When plaintiff filed the underlying lawsuit seeking a tax refund, Revenue and Taxation Code sections 18038.5 and 18152.5 allowed an individual taxpayer to defer gains on the sale of qualified small business stock if the taxpayer purchased other qualified small business stock within 60 days. The deferral was available, however, only if the stock sold and purchased was issued by corporations that used 80 percent of their assets in the conduct of business in California and that maintained 80 percent of their payrolls in California.

In 1998, plaintiff sold stock in an internet start-up company and used some of the proceeds to purchase stock in several other small businesses. The stock he sold did not

2

meet the California property and payroll requirement. Plaintiff nevertheless deferred that part of the gain from the sale that he invested in three other small businesses on his 1998 California tax return. The Franchise Tax Board (the Board) disallowed the deferral. Plaintiff filed a protest; the Board denied the protest; and plaintiff appealed to the State Board of Equalization. Plaintiff paid the $442,000 in tax, penalties and interest that the Board assessed. The State Board of Equalization denied plaintiff's appeal. In September 2009, plaintiff filed the underlying lawsuit for a refund, claiming the California property and payroll requirement violated the commerce clause. The trial court granted summary judgment in favor of the Board, and plaintiff appealed. (*Cutler I*, *supra*, 208 Cal.App.4th at pp. 1251-1252.)

We reversed, concluding the statute was discriminatory on its face and could not stand under the commerce clause. (*Cutler I*, *supra,* 208 Cal.App.4th at p. 1261.) We could not determine the amount of the refund that was owed to plaintiff, if any, because there were material disputes over whether plaintiff qualified for the tax deferral for other reasons apart from the California property and payroll requirement. (*Id.* at p. 1262.) Consequently, the case was remanded to the trial court for further proceedings.

After this court's decision became final, the Board issued a notice dated December 21, 2012, outlining how it planned to rectify its past enforcement of the unconstitutional elements of Revenue and Taxation Code sections 18152.5 and 18038.5. (In *McKesson Corp. v. Florida Alcohol & Tobacco Div.* (1990) 496 U.S. 18, 31, 40-41, the high court held a state must provide "meaningful backward-looking relief" for an unlawful tax collection, and identified three ways to do so: by issuing refunds, making retroactive assessments of tax increases, or a combination of the two.)

The Board's notice stated that, for tax years before January 1, 2008, because of the statute of limitations, "the only way to place similarly situated taxpayers in the same position is to allow the exclusion/deferral to taxpayers who meet the requirements of the statutes other than the unconstitutional California property and payroll requirements." The notice stated that after January 1, 2008, the Board intended to disallow all exclusions

3

and deferrals and thus to issue notices of proposed assessments to taxpayers who had benefited from the discriminatory exclusions and deferrals.

In February 2013, plaintiff filed a motion for attorney fees under section 1021.5. He submitted evidence that he incurred $685,868 in attorney fees litigating this case for a refund of at most $442,000 (including interest and penalties). He contended he vindicated a constitutional right of a large class of California taxpayers by obtaining our ruling that ended the discriminatory treatment of taxpayers who invest in small businesses with more than 20 percent of assets or payroll outside California, allowing "a large class of similarly situated taxpayers who, like [plaintiff], invested in multi-state and out-of-state small businesses to request a refund of taxes that were unconstitutionally levied."

Plaintiff also pointed to a Board analysis in 1993 projecting that the small business stock capital gain exclusion would decrease California tax revenues by more than $250 million between 1998 and 2005, arguing this showed the provisions "have a substantial impact on California investors."

The Board opposed plaintiff's motion, contending plaintiff had the resources to prosecute the action, and the statute was not intended to apply to a sophisticated investor who engages in multimillion dollar stock transactions and seeks a $442,000 refund. The Board argued there was no benefit to California or Californians, because the incentive to invest in small businesses in California had been eliminated; taxpayers for tax years 2008 and after may be subject to additional tax liability; and going forward, taxpayers cannot claim any deferral or exclusion.

Further, the Board argued that plaintiff was sufficiently motivated by his own self-interest in getting a substantial refund, because he had claimed deferral or exclusion of gains on qualified small business stock not only for 1998 but also for tax years 1999 and 2000. A declaration from Ann Hodges, tax counsel for the Board, stated the Board had disallowed plaintiff's claims for 1999 and 2000, and the tax amounts in dispute for those years were $804,948 and $674,541, respectively (not including interest and any applicable penalties). The 1999 and 2000 tax years were not at issue in this lawsuit,

4

Ms. Hodges said, because plaintiff had not exhausted his administrative remedies for those years. The Board argued any potential benefit to the public "was only incidental to [plaintiff's] primary objective of obtaining a refund."

The trial court denied fees. The court acknowledged that plaintiff had enforced an important right affecting the public interest. But, the court held, the "benefit conferred upon others may not prove to be significant." The "practical effect" was the elimination of deferrals for all taxpayers for taxable years 2008 and after (as the Board announced in its December 2012 notice), which would result in the Board's retroactive assessment against taxpayers. This, the court found, was a "significant detriment," and it was "speculative at best" whether the benefit to taxpayers for taxable years 2007 and earlier would outweigh the detriment from the retroactive assessments for 2008 and after. Consequently, the trial court found the litigation did not confer "a significant benefit, whether pecuniary or nonpecuniary, . . . on the general public or a large class of persons." (§ 1021.5)

Further, the court held, plaintiff did not satisfy the requirement that "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ." (§ 1021.5.) This was because plaintiff sought a refund of $442,000, which was a tax on investment gains. "In other words, Plaintiff has significant assets, and was seeking to recover a significant sum of money. The private attorney general attorney fee statute is not required to provide Plaintiff an incentive to bring this litigation, and any benefit Plaintiff conferred upon the public is incidental."

Plaintiff filed a timely appeal of the trial court's order.

**DISCUSSION**

The trial court's judgment on whether a plaintiff has proved each of the prerequisites for an award of attorney fees under section 1021.5 "will not be disturbed unless the appellate court is convinced that it is clearly wrong and constitutes an abuse of discretion." (*Planned Parenthood v. Aakhus* (1993) 14 Cal.App.4th 162, 170; *Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 391 ["If the superior court's order is not consistent with the applicable principles of law, the order necessarily falls outside the

5

scope of the superior court's discretion."].) In this case, we are convinced the trial court's decision was clearly wrong.

## 1.     The Governing Principles

The principles applicable to an attorney fee award under section 1021.5 are these.

First, "eligibility for section 1021.5 attorney fees is established when '(1) plaintiffs' action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons," and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate." ' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214 (*Whitley*), quoting *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935 (*Woodland Hills*). And, there is a fourth requirement:  that "such fees should not in the interest of justice be paid out of the recovery, if any." (§ 1021.5.)  (In *Woodland Hills* (and *Whitley*) that factor did not apply because the plaintiffs' action produced no monetary recovery. (*Woodland Hills, supra,* at p. 935.))

Second, *Woodland Hills* offered two principal points of guidance on the requirement that the lawsuit confer a significant pecuniary or nonpecuniary benefit on the general public or a large class of persons. First, the statutory language "recognizes that in many cases the important gains or contributions rendered by public interest litigation will be reflected in nonmonetary advances." (*Woodland Hills, supra,* 23 Cal.3d at p. 939.) Second, in some cases the "significant benefit" may be recognized "simply from the effectuation of a fundamental constitutional or statutory policy." (*Ibid.*)  The Legislature "contemplated that . . . a trial court would determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Id.* at pp. 939-940.)

Third, the Supreme Court has given clear direction concerning "the financial burden of private enforcement."

"[C]ourts have long construed this language to mean, among other things, that a litigant who has a financial interest in the litigation may be disqualified from obtaining such fees when expected or realized financial gains offset litigation costs." (*Whitley, supra,* 50 Cal.4th at p. 1211.) *Whitley* explains that "the purpose of section 1021.5 is not to compensate with attorney fees only those litigants who have altruistic or lofty motives, but rather all litigants and attorneys who step forward to engage in public interest litigation when there are insufficient financial incentives to justify the litigation in economic terms." (*Ibid*.) " ' "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]" ' [Citation.] 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' [Citation.]" (*Id.* at p. 1215.)

Whitley also describes the method for weighing the costs and benefits of a public interest lawsuit, using *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 (*Los Angeles Police Protective League*) to illustrate the point. " 'The trial court must first fix—or at least estimate—the monetary value of the benefits obtained by the successful litigants themselves. . . . Once the court is able to put some kind of number on the gains actually attained it must discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome. . . . Thus, if success would yield . . . the litigant group . . . an aggregate of $10,000 but there is only a one-third chance of ultimate victory they won't proceed—as a rational matter—unless their litigation costs are substantially less than $3,000. [¶] After approximating the estimated value of the case at the time the vital litigation decisions were being made, the court must then turn to the costs of the litigation—the legal fees, deposition costs, expert witness fees, etc., which may have been required to bring the case to fruition. . . . [¶] The final step is to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to

7

encourage litigation of the sort involved in this case.' " (*Whitley, supra,* 50 Cal.4th at pp. 1215-1216, quoting *Los Angeles Police Protective League, supra,* at pp. 9-10.)

*Whitley* concluded: " '[A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.' " (*Whitley*, *supra*, 50 Cal.4th at p. 1216, quoting *Los Angeles Police Protective League*, *supra*, 188 Cal.App.3d at p. 10.)

## 2. This Case

Here, the trial court correctly found that plaintiff enforced an important right affecting the public interest, satisfying the first prong of the statute. But the court erred in concluding the second and third prongs were not satisfied. And, while the court did not consider the fourth prong – whether "such fees should not in the interest of justice be paid out of the recovery, if any" – we find it would not serve the interest of justice for any part of the fees to be paid out of plaintiff's recovery of any illegally collected taxes. (See *Laurel Heights Improvement Assn. v. Regents of the University of California* (1988) 47 Cal.3d 376, 427 [agreeing with *Wilkerson v. City of Placentia* (1981) 118 Cal.App.3d 435, 445, where the Court of Appeal "appropriately noted" that where the entire basis for the fee award was the appellate opinion, " 'we should make the decision that it qualifies as a case for granting of fees' "; a Court of Appeal "is not required to remand to the trial court the question of whether to award fees under section 1021.5"].)

### a. Significant benefits conferred on a large class of persons

The trial court erroneously concluded that the benefit plaintiff's lawsuit conferred on others "may not prove to be significant." The court's rationale was that, because of plaintiff's lawsuit, the Board decided to eliminate the benefit of tax deferrals previously available to investors in small businesses that met the 80 percent California assets and payroll requirements, and retroactively assess taxes against such investors for the years 2008 and beyond. The court reasoned this was a "significant detriment" to those taxpayers, and although some taxpayers for the years 2007 and earlier would benefit, it was speculative whether there was a net benefit.

This reasoning was erroneous for several reasons.

8

Section 1021.5 on its face looks only to whether the litigation conferred a significant benefit on "a large class of persons" – not to whether some other class of persons might be negatively affected by the equal treatment of all persons similarly situated. The courts may not add a requirement to the statute that does not exist. The analysis of the court in *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217 (*EPIC*) is instructive.

In *EPIC*, the court rejected the argument of the defendants that " 'the courts must balance the respective equities of the benefits and detriments conferred by each party to the suit, and deny fees if on balance no net benefit has been conferred by the [plaintiffs] on a large class of individuals or the general public.' " (*EPIC*, *supra*, 190 Cal.App.4th at p. 231.) The court disagreed, saying the defendants pointed "to nothing in the statutory text that supports their argument. [Citation.] The statute asks whether the successful party's action has conferred a 'significant benefit' (§ 1021.5, subd. (a)), not, . . . a 'net significant benefit.' We are disinclined to adopt a construction of the statute that 'neither the context nor the language of section 1021.5 demands.' [Citation.]" (*Ibid*.)

The Board argues *EPIC* does not apply, because the court addressed only whether it is appropriate to consider the respective benefits conferred by the opposing parties, while here the trial court considered "only the objective impact of [plaintiff's] efforts" when it found no significant benefit. We see no pertinent distinction; the fact remains that the statute does not ask whether the litigation conferred a "net" significant benefit. It asks only whether the lawsuit conferred a significant benefit on a large class of persons. Plainly it did, because California tax law no longer discriminates in favor of investors in small businesses with 80 percent of their assets and payroll in California and against investors (and small business owners) with less than 80 percent of their assets and payroll in California.

Legislative action taken after the trial court rendered its decision below eliminated the "significant detriment" the trial court had found. The Board had planned to rectify the constitutional violation by assessing tax liability retroactively on taxpayers who benefited from the unlawful deferral provisions. But a statute enacted after the trial

9

court's decision effectively reversed the Board's plan to disallow all exclusions and deferral of gains after January 1, 2008, and to impose retroactive tax assessments. In October 2013, the Legislature enacted Assembly Bill No. 1412 which, as the Board acknowledges, eliminated the need for retroactive tax assessments.

The Board contends we should not consider this point and that any benefits taxpayers may receive from Assembly Bill No. 1412 may not be characterized as having been conferred by plaintiff. We disagree. A legislative committee analysis described the *Cutler I* decision and the basis for it at some length (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1412 (2013-2014 Reg. Sess.) as amended Sept. 6, 2013, pp. 4-5), and it is simply not open to doubt that the decision, followed by the Board's determination to implement it by making retroactive assessments, precipitated the legislative action.

The Board relies on *Crawford v. Board of Education* (1988) 200 Cal.App.3d 1397, where the court said that the private attorney general doctrine "limits awards of fees to litigants who successfully utilize the *judicial process* to achieve their aims," and does not "encompass successful lobbying efforts by those who seek to influence the Legislature or the electorate on any particular issue." (*Id.* at p. 1408.) *Crawford* is entirely inapposite. *Crawford* was a complex desegregation case involving litigation over busing as a remedy. The court denied fees to several interveners, concluding they were "simply not prevailing parties within the meaning of . . . section 1021.5." (*Id.* at p. 1410.) During the litigation, the voters passed Proposition 1, the effect of which was to prohibit state courts from ordering mandatory busing on the basis of race, except under certain circumstances. (*Crawford*, at p. 1403.) The court concluded the interveners "failed to affirmatively demonstrate a causal relationship between their participation in the remedial phase of this litigation and the practical result which obtained," and that "none of the interveners . . . can point to any successes resulting from their participation in this litigation independent of the passage of Proposition 1." (*Id.* at pp. 1408, 1409.) This case is not like *Crawford*. The legislation here was a direct result of the *Cutler I* decision and the Board's proposed implementation of it.

10

In the end, there is simply no proper basis for the trial court's conclusion that plaintiff's lawsuit did not confer a significant benefit on a large class of persons. Certainly the general public benefits by nondiscriminatory tax laws that encourage investment by California taxpayers in start-up companies, whether or not 80 percent of the property and payroll of the start-up companies are in California or elsewhere. The public benefits because those investments create new business and job opportunities. And the proliferation of start-up companies nationwide in recent decades demonstrates there is a large class of persons who wish to invest in such companies and who will benefit by nondiscriminatory tax incentives to do so.

### b. The financial burden of private enforcement

The trial court also erred when it concluded that because plaintiff sought recovery of a large amount of money paid as tax on investment gains, and therefore had "significant assets," he did not need the incentive of the private attorney general statute to bring his lawsuit – so that "any benefit Plaintiff conferred upon the public is incidental."

As is apparent from our recitation of the governing principles, *ante*, the Supreme Court's direction on the application of the third factor – "the necessity and financial burden of private enforcement" – is quite clear. The court is required to focus " 'on the financial burdens and incentives involved in bringing the lawsuit.' [Citation.]" (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) An award is appropriate " ' "when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' [Citation.]" ' [Citation.]" (*Ibid.*) The court must weigh the monetary value of the case " 'at the time the vital litigation decisions were being made' " against the costs of bringing the case to fruition, and " 'the bounty of a court-awarded fee' " will be appropriate " 'except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.' [Citation.]" (*Id.* at pp. 1215-1216.)

The trial court did not follow these directions. The court merely observed that plaintiff sought a refund of $442,000, and did not consider that the fee award he sought totaled $685,868 – over $200,000 more than the hoped-for tax refund. Nor did the court

11

discount the $442,000 benefit plaintiff sought by the probability of success at the time he undertook the litigation, as required by *Whitley* (50 Cal.4th at p. 1215).  Plainly, the claimed litigation costs exceeded plaintiff's personal monetary stake by a "substantial margin" – not the reverse.

The trial court erroneously relied on cases such as *Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, where the court observed that section 1021.5 "was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest." (*Beach Colony II*, at p. 114.)  But in *Beach Colony II*, the basis for reversing the trial court's award of $50,550 in fees (*id.* at p. 109) was that the plaintiff made no attempt to compare its litigation costs to the benefits of saving $300,000 in offsite improvement expenses and establishing its right to develop the property for significant commercial gain.  (*Id.* at pp. 113-114.)  That is not the case here, where plaintiff produced evidence of legal fees that were more than $200,000 greater than the refund he sought.

The trial court's fundamental error was the assumption that it need not undertake the analysis described in *Whitley* when a plaintiff is wealthy.  Nothing in *Whitley* allows or implies such a distinction.  Indeed, the contrary is so.  The *Whitley* court's description of the legislative history of section 1021.5 is instructive.  For example:  " '[S]ubstantial benefits to the general public should not depend upon the financial status of the plaintiff or upon the charity of foundations or upon the charity of public-minded lawyers alone. Where the benefit is conferred upon a large number of persons, it is inequitable that a person who steps forward to enforce the rights should bear the entire cost.' "  (*Whitley*, *supra*, 50 Cal.4th at p. 1219, quoting Testimony of John R. Phillips to Sen. Judiciary Com, Aug. 16, 1977, in support of Assem. Bill No. 1310 (1977-1978 Reg. Sess.) pp. 7-8 (Phillips testimony).)  *Whitley* found it "noteworthy" that the legislative history it cited "does not focus on litigants' initial subjective motivation—on what may cause them to want to bring a public interest lawsuit.  What section 1021.5 does address is the problem of affordability of such lawsuits." (*Whitley*, at p. 1219.)

12

*Whitley* further observed that "public interest litigation prior to section 1021.5 depended on subsidies either from well-heeled litigants and their supporters, or from the pro bono work of attorneys." (*Whitley*, *supra*, 50 Cal.4th at pp. 1219-1220, citing Phillips testimony, *supra*, at pp. 7-8.) The court continued: "Section 1021.5 addresses this affordability problem with the inducement of attorney fees for public interest litigation when certain conditions in the statute are met. Stated another way, the Legislature that enacted section 1021.5 was not so much concerned with what brought a litigant with a potential public interest case into an attorney's office, but rather with allowing that litigation to move forward from there by offering at least the prospect that the financial burden of the litigation could be shifted to the opposing party if the litigant prevailed." (*Whitley*, at p. 1220.)

Of course, it is certainly the case, as the Board points out, that the "central problem that section 1021.5 seeks to address" is the "inherent unaffordability of legal services for public interest cases yielding primarily nonpecuniary benefits." (*Whitley*, *supra*, 50 Cal.4th at p. 1225.) But nothing in *Whitley* or other Supreme Court precedents suggests that a different analysis may be applied in public interest cases that do yield pecuniary benefits, or that "well-heeled litigants" should nevertheless be required to subsidize public interest litigation. (*Id.* at p. 1219.) The point of section 1021.5 was to make that unnecessary. The statute itself anticipates the benefit may be "pecuniary or nonpecuniary." (§ 1021.5.)

In short, *Whitley* is clear that the *only* pertinent inquiry when a court assesses the financial burden of the litigation is the plaintiff's "objective financial incentives" – whether the expected value of the litigant's own monetary award, discounted by the risk of achieving the desired award, exceeds by a substantial margin the actual litigation costs. The court failed to adhere to this standard, and therefore erred.

We note one further point. The trial court, at the hearing on the attorney fee motion, stated that "plaintiff had approximately $450,000 at stake here . . . ." The evidence before the court showed only that the "expected value of the litigant's own monetary award" from the litigation (*Whitley*, *supra*, 50 Cal.4th at p. 1216) was – at the

13

most – approximately $450,000. The Board nonetheless tells us the trial court "was aware that the true value of this case to [plaintiff] far outweighed any 'costs,' " because two other tax years (1999 and 2000) were at issue in administrative proceedings below, so that plaintiff "was pursuing a total financial benefit of more than $1.7 million dollars."

There is no support for this argument in the record. The Board now asks us to take judicial notice of three documents (a memorandum of September 23, 2009, with two attachments, documents plaintiff's counsel filed with the Board) that it asserts show the issues before the Board for the other two tax years were "identical" to those in this case.

We deny the request for judicial notice, for several reasons. The first is that the Board did not provide these documents to the trial court, even though they were available and could have been submitted had the Board chosen to do so. " 'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances." (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.) There are no exceptional circumstances here.

Second, "[w]hile we may take judicial notice of court records and official acts of state agencies . . . , the truth of matters asserted in such documents is not subject to judicial notice . . . ." (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482, citations omitted.) Here, the Board's brief makes clear that it wants this court to take judicial notice of the truth of statements by plaintiff's counsel in the two attachments, to the effect that this case involves the same issues as the pending proceedings before the Board involving plaintiff's claims for the 1999 and 2000 tax years. This we may not do.

Third, and from a practical perspective, the most significant point is that these documents shed no light on what amount of taxes, if any, plaintiff may recover (or not be required to pay) for 1999 and 2000. The Board contends in its brief that the 1999 and 2000 tax years "have remained in [deferral] status as of the date of this brief [March 18, 2014]," so what tax obligations plaintiff may avoid for those years remains in dispute. Because it is premature to infer what recovery plaintiff might obtain for tax years 1999 and 2000, the matters we are asked to judicially notice are irrelevant to this appeal.

14

We reiterate one important point.  As *Whitley* tells us, the "monetary value of the benefits obtained" must be discounted by the probability of success at the time plaintiff was considering whether to file this lawsuit.  (*Whitley*, *supra*, 50 Cal.4th at p. 1215.)  Here, plaintiff faced very long odds of success and undertook the risk of incurring substantial costs and fees.  Persuading a court to declare *any* statute unconstitutional -- particularly a tax statute that favors California interests -- is always an uphill battle.  The difficulty of persuading a court to declare these tax statutes unconstitutional is demonstrated by the trial court's grant of summary judgment in favor of the Board, rejecting plaintiff's constitutional challenge.

In sum, the monetary value of this case discounted by the probability of success was far from sufficient to absorb the costs of litigation and provide an incentive to litigate.

### c.      The "interest of justice" - payment of fees out of the recovery

Because the trial court concluded that other statutory factors were not met, it did not consider the final factor in section 1021.5, whether fees should in the interest of justice be paid out of the recovery, if any.  (§ 1021.5.)

The Board contends the interest of justice demands payment out of the recovery, because this litigation "would have been pursued absent any prospect of a fee award given the totality of the circumstances."  We are not persuaded.

First, the Board's premise, as we have already concluded, is wrong.  The case was a risky one where the expected value of the case was not sufficient to absorb litigation costs and still provide an incentive to litigate.

Second, the cases that find attorney fees should be paid out of the recovery are uniformly cases where a fund has been created -- a fund containing money besides the amount due to the plaintiff -- from which fees could be paid.  Typically, these cases are class actions, where courts have determined that part or all of the fees should be paid under the equitable "common fund" theory.  (See *Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 148, fn. 5 ["When a successful litigant's efforts result in the

15

creation of a fund from which others derive benefits, the fund is known as a 'common fund.' "].)

There are taxpayer cases where a fund has been created, but they are unusual. "Generally, taxpayers' suits result in the vindication of an important public right, but do not result in the creation of a fund." (*Bank of America v. Cory* (1985) 164 Cal.App.3d 66, 89; *id.* at pp. 71, 90-91 [common fund was created as the result of complicated litigation involving enforcement of the unclaimed property law; court held that those benefitting from the recovery of the fund "must bear their share of the cost of litigation," and confined the award of fees to the common fund theory rather than section 1021.5; see also *Rider v. County of San Diego* (1992) 11 Cal.App.4th 1410, 1422, 1421, fn. 5, 1423 [holding fees should not be paid under section 1021.5; interest of justice mandated payment of taxpayers' attorney fees "from the recovered fund of invalidly collected supplemental sales tax revenues rather than from the general funds of the County," where tax revenues were collected and retained pending final decision in the taxpayer action challenging the tax].)

This case did not lead to the creation of any "common fund" or "recovered fund." Indeed, when the trial court ruled on attorney fees, plaintiff had recovered nothing at all, as other aspects of plaintiff's qualification for the tax deferral were still in dispute. Apparently, the parties have settled the dispute as to the 1998 tax year only, but we presume the settlement was confidential, because no party has told us that plaintiff ever actually recovered *any* of the $442,000 he paid for that tax year while pursuing his appeal and this litigation.

Where no "common fund" has been created, and where it has been established that the financial burden of private enforcement exceeded the plaintiff's personal stake in the litigation, the trial court does not have the discretion to determine, "in the interest of justice," that fees nonetheless should be paid from the plaintiff's own recovery. Therefore, no purpose would be served by remanding for the trial court to decide whether the final factor in section 1021.5 has been met, as that is the only conclusion one may reach as a matter of law. (See *Los Angeles Police Protective League*, *supra*,

16

188 Cal.App.3d at p. 14 ["This disparity between financial burden and financial benefit is enough in itself to satisfy the *fourth* element of the section 1021.5 test. Clearly it would be inappropriate to require the attorney fees to be paid out of the proceeds of the litigation since that would completely wipe out the [union] members' monetary recovery."]; *Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 847 [where it was "clear the financial burden which this suit placed on [the plaintiff] was out of proportion to his personal stake" in the litigation, "[f]or the same reason, we have no difficulty holding [the plaintiff's] attorney fees 'should not in the interest of justice be paid out of the recovery' and it would be an abuse of discretion to hold they should."].)

Because all the elements for an award of fees under section 1021.5 were established, the trial court abused its discretion in refusing to award fees.

## DISPOSITION

The order is reversed and the cause is remanded to the trial court with directions to determine the amount of attorney fees to be awarded to plaintiff. Plaintiff shall recover costs on appeal.

GRIMES, J.

We concur:

BIGELOW, P. J.

FLIER, J.

17